ESTATE OF GEHL: GEHL and another, Administrators, w. w. a., Appellants, v. REINGRUBER and others, Respondents.

*No. 268. Argued May 6, 1968.—Decided June 4, 1968.*
(Also reported in 159 N. W. 2d 72.)

For the appellants there was a brief by *Tily & Koch,* and oral argument by *John P. Hayes,* all of Milwaukee.

For the respondents there was a brief by *Lester J. Dencker,* attorney, and *John B. Werra* of counsel, both of Milwaukee, and oral argument by *Mr. Dencker.*

HEFFERNAN, J. The respondents contend that the use of the word, "children," by the testatrix constitutes a latent ambiguity and that, therefore, extrinsic evidence is properly permitted to show that the stepchildren, as well as the natural child, of Theresa Gehl were to be included in the term. While we agree with respondents' ultimate conclusion, we do not agree that there is an ambiguity which calls into play the rules delineating the use of extrinsic evidence. The proper rule was stated in *Estate of Gibbs* (1961), 14 Wis. 2d 490, 496, 111 N. W. 2d 413:

"Under rules as to construction of a will, unless there is ambiguity in the text of the will read *in the light of surrounding circumstances,* extrinsic evidence is inadmissible for the purpose of determining intent." (Emphasis supplied.)

When the surrounding circumstances have been considered and an ambiguity appears or remains, then only may there be a resort to extrinsic evidence. This is the clear rule in Wisconsin. The reason that we first look to surrounding circumstances is pointed out by McCormick in his text, *Evidence* (hornbook series), p. 448,

sec. 220. He states that, unlike a contract, a will is a unilateral transaction consisting of words whose meaning is to be ascertained subjectively. The question is not what the usual usage of a word may be or the dictionary usage, but the testator's individual meaning.

This distinction is also discussed in Atkinson, *Wills* (hornbook series, 2d ed.), p. 810, sec. 146, wherein it is stated:

"However strong the argument for an objective standard in case of contracts, the words of a will should be given the meaning that the testator gives them as distinguished from the usual or dictionary meaning. A court can never be confident as to testator's probable meaning unless it puts itself into the testator's armchair so as to see what he knew, liked, disliked and how he talked and wrote about the matters connected with his disposition."

9 Wigmore, *Evidence* (3d ed.), p. 227, sec. 2470, points out:

". . . words of a document are never anything but indices to extrinsic things, and that therefore *all the circumstances must be considered which go to make clear the sense of the words,*—that is, their associations with things."

Wigmore, *supra,* page 228, also points out that in the field of wills, ". . . there is none but the individual standard of meaning to be considered." The same section of Wigmore cites with approval Mr. Justice BLACKBURN in the case of *Allgood v. Blake,* L. R. 8 Exch. 160:

" 'The general rule is that in construing a will the Court is entitled to put itself in the position of the testator, and to consider all material facts and circumstances known to the testator with reference to which he is to be taken to have used the words in the will, and then to declare what is the intention [*i.e.,* sense] evidenced by the words used, with reference to those facts and circumstances which were (or ought to have been) in the mind of the testator when he used those words. As said in

Wigram on Extrinsic Evidence, "The question in expounding a will is, not what the testator meant—as distinguished from what his words express,—but simply, what is the meaning of his words." But we think that the meaning of words varies according to the circumstances of and concerning which they are used.'"

Restatement, 3 *Property,* p. 1196, sec. 242, lays down as the general rule that:

"The judicially ascertained intent of a conveyor is normally determined by the language employed in his conveyance, read as an entirety and in the light of the circumstances of its formulation."

Comment *d*, p. 1199, sec. 242, points out:

"The instrument consists of words and it is always permissible to establish the sense in which the conveyor is accustomed to use the words therein contained . . . . Thus it is proper to prove the special usages of words, or other symbols, in the business with which the conveyor is familiar . . . . It is also proper to prove that the conveyor customarily designated a particular person by a name other than the baptismal name of such person . . . , or that he customarily spoke of a particular person as his 'son,' 'grandson,' 'cousin' or other similar relation, despite the nonexistence in fact of such relationship . . . . Evidence establishing a vocabulary peculiar to the conveyor can result in an instrument being found to have a meaning wholly at variance with the dictionary meaning of the language employed."

Professor William Herbert Page, 4 Page, *Wills* (Bowe-Parker Rev.), pp. 51, 52, sec. 30.8, states:

"While the intention of the testator is to be ascertained in the first instance from the language which is used in the will, his intention frequently cannot be ascertained from such language alone. The testator used this language in view of the surrounding circumstances as known to him and with reference thereto. If the court refuses to consider the surrounding circumstances it means the court declines to place itself in the position in which testator was when he used the language which the

court is trying to construe; and the meaning which is thus ascertained is very likely to be different from the meaning which the testator in question had, as well as different from the meaning which the average testator would have had under like circumstances. For these reasons the court places itself in the position in which testator was when he made the will, and the will is construed in the light of the surrounding facts and circumstances."

The essence of our inquiry then is to determine the reasonable meaning of the words actually used.

We pointed out in *Estate of Breese* (1959), 7 Wis. 2d 422, 426, 96 N. W. 2d 712, that although a will speaks as of the time of death, the language is to be interpreted in light of the circumstances surrounding the testator at the time the will is written. If, from those circumstances, the testator's meaning is clear, we need inquire no further. If, after that inquiry, equivocation or uncertainty still appears, an ambiguity is said to exist, and the rules of construction relevant to the resolution of these ambiguities become applicable. *See Estate of Gibbs* (1961), 14 Wis. 2d 490, 111 N. W. 2d 413. As Wigmore points out, however, on p. 227, sec. 2470, footnote 11:

"The 'ambiguity' doctrine, correctly considered, has reference only to an offer of expressions of intention (*post*, sec. 2470), and not to circumstances in general, nor to the parties' usage or understanding of the meaning of words."

Thus in the instant case if, from the examination of the surrounding circumstances, we are able to find, with reasonable certainty, the meaning of the testatrix's words, there need be no resort to the esoteric rules applicable to the introduction of extrinsic evidence when an ambiguity still remains. When we thus place ourselves, as the trial judge properly did, in the chair of the testator, and subjectively view the words used, it becomes clear that the word, "children," meant to Theresa Gehl

not only her natural son, John, but the six other motherless children that she had raised from infancy. It is undisputed that she treated her natural child in precisely the same manner as she treated the children of her husband. When she married Adrian Gehl she asked the children to call her "mother." She habitually referred to all of these infants as "my children." She referred to them individually as "my son" or "my daughter." The entire record is indicative of a family situation, of a mutual exchange of parent-child love, with Theresa Gehl exercising all the disciplinary prerogatives of a parent. The only aberrant note in a completely usual family relationship was the fact that Theresa was not the blood mother of six of these children.

It was also undisputed that even after the children of Adrian Gehl became adults, Theresa visited their homes for long periods of time and the relationship continued to be that of a well-loved parent and adult children. Thus it is almost conclusive, certainly clear beyond reasonable argument, that when Theresa Gehl used the expression, "children," she referred to all seven of the youngsters in the family. As Professor Page says, *supra*, p. 143, sec. 30.21:

"If it can be shown that testator habitually made use of a word, phrase, and the like in a meaning different from its general meaning, such expression may be used in the sense in which he used it habitually."

It is argued by the appellants that the word, "children," should be construed in its normal sense, indicating a blood relationship. However, a part of the surrounding circumstances of the execution of the will was the fact that Theresa Gehl was then sixty-three years of age. It is therefore contrary to all probabilities that she would have used the expression, "children," in the anticipation of another natural child who would share in even and equal shares with her natural son, John. Yet, she used

not the expression "son" or "child" but the plural, "children," and said that her estate was to be given to them "in even and equal shares." This provision, in light of all the circumstances, makes no sense unless we interpret her words as she habitually used them—to apply not only to her natural child but the children of Adrian with whom she stood in the practical relation of parent.

One of the surrounding circumstances of the execution of this will was that the scrivener was a layman. It is an accepted principle of interpretation:

"If the will is drawn by one who is not a trained lawyer, the court will be more inclined to assume that the will is written in the language of the layman and will regard the language of the will as used in its popular rather than in its technical meaning." 4 Page, *Wills,* p. 65, sec. 30.9.

Atkinson, *Wills, supra,* p. 811, sec. 146, says:

"It is practically necessary that the testator's intent should be identified with that of the agent whom he employed to express the intent."

Thus it appears reasonable to conclude that the words as used in the will were used with her intent as to meaning rather than that of an expert scrivener. Had this will been drafted by a lawyer, it would be reasonable to assume, at least in the absence of other evidence of the testator's meaning, that the term "children" was used as a word of art expressing the technical-legal or biological relationship. This, however, is not the fact, and we are concerned not with the interpretation of a lawyer's phrase but with the words as used by Theresa Gehl. Looking at the meaning of the words as used by Theresa Gehl, in light of the surrounding circumstances, there is no ambiguity, and it is manifest that the term "children" as used by her includes the six children of Adrian Gehl as well as her natural son.

*By the Court.*—Judgment affirmed.