STATE EX REL. WARREN, Attorney General, Petitioner, v. REUTER, Director of Finance, Respondent.

*No. State 29. Argued September 3, 1969.—Decided October 3, 1969.*
(Also reported in 170 N. W. 2d 790.)

202

204

For the petitioner the cause was argued by *Allan P. Hubbard,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, and *Warren M. Schmidt,* assistant attorney general.

For the respondent there were briefs by *Michael, Best & Friedrich,* attorneys, and *John K. MacIver, Frank J. Pelisek,* and *Thomas E. Obenberger* of counsel, all of Milwaukee, and oral argument by *Mr. Pelisek.*

Briefs amici curiae were filed by *Robert B. Murphy* of Madison and *John A. Kluwin* of Milwaukee, for the State Medical Society of Wisconsin, and by *Foley, Sammond & Lardner* and *Marvin E. Klitsner, John R. Collins, Michael S. Nolan,* and *Michael J. Zimmer,* all of Milwaukee, for the Greater Milwaukee Committee, and Medical Center of Southeastern Wisconsin.

HALLOWS, C. J.   Ch. 3 of the Laws of 1969,[1] which we hold is constitutional, created secs. 20.250 and 39.15, Stats., and made an appropriation of $1,000 for the 1969–71 biennium to the Marquette School of Medicine, Inc., for medical education, teaching, and research. We are

[1] "AN ACT to create 20.250 and 39.15 of the statutes, relating to state aid for medical education at the Marquette school of medicine and making an appropriation.

". . .

"SECTION 2. At the appropriate place in the schedule in section 20.005 of the statutes, insert the following amounts for the purposes indicated:

|  | | 1969–70 | 1970–71 |
|---|---|---|---|
| "20.250 Marquette school of medicine | | | |
| "(1) AID FOR MEDICAL EDUCATION | | | |
| "(2) Gen. program opns.      GPR      A | | 500 | 500 |

"SECTION 3. 20.250 of the statutes is created to read:

"20.250 Marquette school of medicine. There is appropriated to the Marquette school of medicine, inc., for the following program:

"(1) AID FOR MEDICAL EDUCATION. (a) General program operations. The amounts in the schedule for medical education, teaching and research. The amounts appropriated under this paragraph shall be transferred from the appropriation under s. 20.505 (1) (a).

"SECTION 4. 39.15 of the statutes is created to read:

"39.15 Aid for medical education. (1) At such time as the governor directs, the Marquette school of medicine, inc., shall submit its budget request under s. 20.250 to him, and submit a copy thereof to the coordinating council for higher education. The coordinating council shall conduct a biennial program analysis for those programs of the school which are supported in part by these state funds and include an advisory report on its findings and recommendations in its report under s. 15.04 (4). The legislative audit bureau shall biennially post-audit expenditures under s. 20.250 so as to assure the propriety of expenditures and compliance with legislative intent.

"(2) As a condition to the release of funds under s. 20.250, one-third of the members of the board of trustees of Marquette school of medicine, inc., shall be nominated by the governor, and with the advice and consent of the senate appointed, for staggered 6-year terms expiring on May 1 and the school shall give 1st preference in admissions to residents of this state.

". . ."

told this is a token appropriation and that if the law is held constitutional, it is contemplated additional funds will be appropriated. There are presently pending in the legislature bills providing appropriations totaling $3,200,000. Sec. 39.15 requires the Marquette School of Medicine to submit a budget request to the governor at such time as he shall direct and also a copy of the budget request to the coordinating council for higher education. The coordinating council is obliged to conduct a biennial program-analysis and make an advisory report to the governor. The legislative audit bureau must biennially postaudit the expenditures of the appropriated funds so as to assure the propriety of the expenditures and the compliance with legislative intent.

The Marquette medical school has been variously characterized in the briefs as a private institution, a sectarian institution, and an independent *quasi*-public body. The facts are Marquette School of Medicine, Inc., is a nonprofit corporation organized pursuant to ch. 181, Stats. It is a legal entity entirely separate from Marquette University. It is without members or stockholders and no person has a proprietory interest therein. Six of its 18-member board of trustees are appointed by the governor of the state of Wisconsin upon the advice and consent of the senate. The remaining twelve trustees are elected for staggered terms by the elected trustees whose terms have not expired. Prior to September, 1967, the medical school was a corporate body but was a part of and legally controlled by Marquette University. In September, 1967, the medical school amended its articles of incorporation and separated itself from the university. The medical school owns its own assets but is presently conducting its classes on the Marquette University campus in a building leased rent free from the university from whom it purchases its utility services. The medical school conducts certain educational programs jointly with Marquette University and also has joint programs with

the Milwaukee County General Hospital, Milwaukee Children's Hospital, Veterans' Administration Hospital, Milwaukee Psychiatric Hospital, and Curative Workshop of Milwaukee, Inc. The programs with the hospitals are for the purpose of providing staff positions for the medical-school faculty and for teaching and research.

The appropriation arises out of and in response to the recommendations of the governor's task force on medical education.[2] This committee of 20 outstanding citizens aided by a technical staff of six experts examined the need for physicians as one of the resources of health care in Wisconsin and found the Wisconsin physician-manpower was below the average for both the midwest and the entire nation, in that there are 143 physicians per 100,000 population nationwide and 136 in the seven upper midwest states, while Wisconsin has only 119. In 1966 Wisconsin had only 4,904 practicing physicians. During the eleven years preceding 1967 the two medical schools of this state, Marquette University Medical School and the University of Wisconsin Medical School, produced an average of 161 physicians per year, of which 55 percent came from Marquette. While an average of 35 percent of the graduates of these two medical schools remain in Wisconsin, many doctors trained outside of the state have come here to practice. But the net result of emigration of doctors trained in Wisconsin and the immigration of those trained outside Wisconsin has been an average deficit of 19 doctors per year. The report also points out Wisconsin has a substantially higher proportion of aged persons than the nation as a whole, with 10.2 percent of its population aged sixty-five years or over in 1960 and this class of persons needs more medical care than younger persons.

The population in Wisconsin is expected to grow approximately from 4,000,000 to 5,220,000 by 1985 and

[2] *See Report of the Governor's Task Force on Medical Education* dated Dec. 5, 1967, Donald C. Slichter, Chairman.

the national average physician population ratio from 143/100,000 to 160 doctors per 100,000 people shortly after 1973. The report by the task force recommends Wisconsin physician resources should not be less than the national average and to attain this, Wisconsin must not only keep its present two medical schools and increase their flow of graduates but also establish another medical school.

We need not go into further detail concerning the findings of the task force and the reasons why Wisconsin is behind in medical-care resources. Specifically to attain sufficient medical doctors to care for the health of Wisconsin residents, the committee strongly recommended increasing the incoming freshman class of the University of Wisconsin Medical School from 104 places to 160, expanding Marquette medical school to 160 first-year places and the establishing of a new medical school in Milwaukee having a first-year enrollment by 1975 of 100 first-year students. The report also points out that the Marquette School of Medicine currently faces critical financial problems for its operating programs and its continued operation with an operating deficit of $1,500,000 per year is impossible without state help.

It must be pointed out the Greater Milwaukee Committee and Medical Center of Southeastern Wisconsin in their amicus curiae brief state that the Medical Center of Southeastern Wisconsin is a nonprofit, unincorporated association, whose members include the Milwaukee County Institutions, Milwaukee Children's Hospital, Milwaukee Psychiatric Hospital, Veterans' Administration Hospital, Milwaukee Blood Center, and Marquette medical school. The purpose of this medical center is to advance health service, education and research so as to alleviate and maintain on a high level the quality of medical care in southeastern Wisconsin. It recognizes that medical education is the keystone of its integrated program and the Marquette medical school is the foundation for medical

education. The committee contemplates a medical school building for the teaching of the basic sciences will be built near the county hospital on county grounds in Milwaukee, which will house the medical school; and if plans progress according to anticipation, this will happen in 1975.

### Public Purpose Doctrine.

The first attack on the constitutionality of the law appropriating funds to the medical school is based on the public purpose doctrine; it is contended the appropriation is not for a public purpose because: (1) It supports a private school which is not a public purpose, and (2) the effect on public health is not a direct and immediate benefit. We need not go into the origin or the validity of the doctrine which commands that public funds can only be used for a public purpose. The doctrine is beyond contention and recently was the subject of exposition by this court. *State ex rel. Bowman v. Barczak* (1967), 34 Wis. 2d 57, 148 N. W. 2d 683; *State ex rel. La Follette v. Reuter* (1967), 36 Wis. 2d 96, 113, 153 N. W. 2d 49. *See also* Mills, *The Public Purpose Doctrine in Wisconsin,* 1957 Wis. L. Rev. 40; *Soens v. Racine* (1860), 10 Wis. 214 (*271); *Heimerl v. Ozaukee County* (1949), 256 Wis. 151, 40 N. W. 2d 564; *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 175, 277 N. W. 278, 280 N. W. 698.

Nor need we discuss the presumption of constitutionality, which every act of the legislature is entitled to be accorded. This doctrine is too well and rightly established to be challenged. *Gottlieb v. Milwaukee* (1967), 33 Wis. 2d 408, 147 N. W. 2d 633; *Madison Metropolitan Sewerage Dist. v. Committee* (1951), 260 Wis. 229, 50 N. W. 2d 424; *Petition of Breidenbach* (1934), 214 Wis. 54, 252 N. W. 366; *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 558, 61 N. W. 2d 903. We recognize,

too, that to render a statute unconstitutional, its conflict with a constitutional provision must be clear and free from doubt. *Chicago & N. W. Ry. v. La Follette* (1965), 27 Wis. 2d 505, 521, 135 N. W. 2d 269.

Although this court is not bound by the declaration of public purpose contained in an act, nevertheless what constitutes a public purpose is in the first instance a question for the legislature to determine and its opinion should be given great weight. The legislature, of course, cannot call black white or even gray white to reach a result; but it does have discretion in its declaration of public purpose. *State ex rel. Bowman v. Barczak, supra; David Jeffrey Co. v. Milwaukee* (1954), 267 Wis. 559, 578, 66 N. W. 2d 362. In *State ex rel. Reynolds v. Nusbaum* (1962), 17 Wis. 2d 148, 115 N. W. 2d 761, this court did not accept the declaration of the legislature but determined the purpose of the school bus law in its "realistic operation" was to benefit the private schools rather than promote the safety of children. We have no such problem in this case because the declaration of the legislature is supported by the facts.

The declaration states the level of physician resources for health care in Wisconsin is below the averages for the midwest and the nation and needs to be improved; and to provide adequate physician manpower, this state must expand its program for training new physicians. The legislature accepts the recommendations of the governor's task force on medical education, that financial support is needed to increase the number of medical students at Marquette School of Medicine. And, most importantly, the legislature determined ". . . this improvement of medical education opportunities is essential to the health and welfare of this state, and is in the public interest and required to meet the health needs of our expanding population." This is a clear-cut and unambiguous statement of public need and purpose.

It is now our duty to evaluate the public purpose and the means of attaining it provided by ch. 3 of the Laws of 1969. Some of the factors for determining public purpose were laid down years ago in *State ex rel. Wisconsin Development Authority v. Dammann, supra,* at page 180:

"The course or usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, and the objects and purposes which have been considered necessary for the support and proper use of the government are all material considerations as well as the rule that to sustain a public purpose the advantage to the public must be direct and not merely indirect or remote."

The court recognized that the concept of public purpose is a fluid one and varies from time to time, from age to age, as the government and its people change. Essentially, public purpose depends upon what the people expect and want their government to do for the society as a whole and in this growth of expectation, that which often starts as hope ends as entitlement. Until recently, man has accepted sickness as a normal phenomenon. But in this century, science has discovered many health hazards can be eliminated or controlled. Preventative medicine and earlier care have become the expectations. It is common knowledge the rising trend in the demand for health services is beyond present resources.

As said in *Laughlin v. City of Portland* (1914), 111 Me. 486, 90 Atl. 318, and as quoted in *State ex rel. Wisconsin Development Authority v. Dammann, supra,* at 182, "Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual efforts may vary," and consequently, "what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. . . . Its two tests

are: First, the subject matter, or commodity, must be one 'of public necessity, convenience or welfare.' . . . The second test is the difficulty which individuals have in providing it for themselves."

It cannot be seriously questioned that the health of the people of this state is of great concern and the proper object of our state government's interest. We stated over twenty-five years ago in *State ex rel. Martin v. Juneau* (1941), 238 Wis. 564, 571, 300 N. W. 187, "that the promotion and protection of public health is a matter of statewide concern." *See also State ex rel. Wisconsin Development Authority v. Dammann, supra.*

But the respondent does not dispute that public health is a public purpose so much as he argues the appropriation will support a private school which is not a public purpose. This argument confuses the means with the end. An act is constitutional if it is designed in its principal parts to promote a public purpose so that the attainment of the public purpose is a reasonable probability. We cannot take the short rather than the long view of the problem because a private school is used as a means to attain the end. The appropriation is not primarily to benefit the Marquette School of Medicine but to promote and maintain public health. This law is no frivolous pretext for giving money to a private school but the using of a private school to attain a public purpose. What benefit is derived by the medical school is necessary and incidental to the main purpose. The advantage to the public of increasing the number of doctors in Wisconsin to maintain and promote public health is direct and not indirect or remote. Because there are several necessary steps in the process does not make the end remote and certainly not indirect. The means used by the legislature to attain this public purpose are not only reasonable but necessary.

It is argued, however, the appropriation will not attain its purpose because only 35 percent of the medical graduates of the Marquette School of Medicine stay in Wis-

consin to practice medicine. About the same percentage is true for the University of Wisconsin Medical School, but it has not been argued that all graduates of the state university must stay in Wisconsin to justify the existence of the school. The legislature did recognize some merit in this argument and provided that as a condition to the release of funds under ch. 3, Laws of 1969, the medical school must give first preference of admission to residents of this state. We think, too, the strengthening of the faculty of the school of medicine will promote postgraduate medical study opportunities in the Milwaukee-area hospitals, which, in turn, will increase the number of young doctors who remain in Wisconsin to practice.

The respondent relies on *Curtis' Administrator v. Whipple* (1868), 24 Wis. 350, 358, for the proposition that state tax money cannot be used to aid a private educational institution. But *Whipple* is distinguishable from this case. In this case we are primarily dealing with the public health and the medical school is merely the means by which health care is to be improved, while in *Whipple* the matter of helping a school was the end in itself and the public benefit was incidental and indirect.

### Is Marquette School of Medicine a proper agency to carry out a public purpose?

While the respondent states the government may appropriate money to reimburse a private corporation for expenditures incurred by it in accomplishing specified public purposes, he argues such an appropriation is invalid when paid to or through a private corporation which is not under proper governmental control and supervision. This proposition is undoubtedly true but, what is proper governmental control and supervision as used in *State ex rel. Wisconsin Development Authority v. Dammann, supra?* This court stated in *Wisconsin Industrial School for Girls v. Clark County* (1899), 103 Wis. 651, 667, 79 N. W. 422, in considering the propriety of the use of a

private corporation at public expense for the care and maintenance of needy children that the test to be applied was whether such agency was "under reasonable regulations for control and accountability to secure public interests." The respondent argues, relying on *State ex rel. American Legion 1941 Convention Corp. v. Smith* (1940), 235 Wis. 443, at p. 462, 293 N. W. 161, that there should be auditing safeguards before any expenses are incurred by such agency. It is also argued that *Wisconsin Keeley Institute Co. v. Milwaukee County* (1897), 95 Wis. 153, 70 N. W. 68, requires a private agency to be "controlled and managed by the state." In *Whipple* the appropriation was struck down as unconstitutional, partly because no control or supervision existed in the town or taxpayers by way of postaudits, voice in management, and in other respects.

The question of reasonable regulations for control and accountability to secure the public interest is one of degree and depends upon the purposes, the agency and the surrounding circumstances. Only such control and accountability as is reasonably necessary under the circumstances to attain the public purpose is required. Budgeting and auditing are, of course, basic and necessary controls; additional types of control vary with the demands or requirements of the circumstances. What would be sufficient control for daily operations may not serve for capital improvements and vice versa. What controls may be necessary for an agency to be formed may not be necessary for an agency which has been operating for many years and has established an acceptable policy and is under regulations and control of other governmental bodies. Likewise, controls which are sufficient today for this appropriation may not be sufficient tomorrow under different circumstances.

The appropriation at issue is not for capital improvements or for long term future expenditures but to make up an expected deficit the next two years in the estab-

lished normal operation of the school. This operation has been and is subject to review and approval of the accrediting authority for medical schools and of certain federal agencies. At least 50 percent of the expenditure of the medical schools in the United States are derived from federal funds. *Task Force Report,* page 23. A private agency cannot and should not be controlled as two-fistedly as a governmental agency. If such need for control is present, it might be better to use a governmental agency. A private agency is selected to aid the government because it can perform the service as well or better than the government. We should not bog down private agencies with unnecessary governmental control.

The respondent argues the operational budget of the medical school needs to be submitted to the governor only at such times as he requests. We fail to see why this control is lacking merit unless one presumes the legislature will appropriate money without a budget or that the governor will fail to request a budget. As an additional safeguard, the budget must be submitted to the coordinating council of the state of Wisconsin for examination and evaluation and the council shall make an advisory report to the governor. There is a budgetary audit of the expenditure of the funds and the state of Wisconsin has a one-third representation on the board of trustees. It is true the majority of the board is not appointed by the governor with the consent of the senate, but the remaining members are citizens interested in public health and medical education and in no sense are proprietors or owners. They have no individual pecuniary interest in the medical school.

We do not think it is necessary or required by the constitution that the state must legally be able to control the agency corporation in order to find sufficient regulations for control and accountability. The state is not interested in controlling the day-to-day operation of the medical school but in its end product.

The insistence upon legal control of the school by the state would be the death of the independent and private agencies aiding the government in its welfare programs and would require all agencies to be in effect state agencies. The concept of a republican form of government does not require that all public health must directly be effectuated at a government office. It is only when the difficulty which individuals have in providing for themselves is insurmountable that the government should step in; but that step should be no more than is necessary and should not supplant private agencies if such agencies can be used as a means to attain the public purpose. We conclude there is sufficient control and supervision of the medical school under present conditions for the purpose of the appropriation for this biennium.

While not conclusive or even authoritative but rather as illustrative, the legislature has in the past made appropriation to private organizations to attain stated public goals with no more and perhaps less control than ch. 3, Laws of 1969. For instance, sec. 45.40, Stats., authorizes the transfer of $50,000 to the American Legion for the purpose of purchasing and maintaining a camp for disabled veterans and their dependents. Ch. 51, Laws of 1967, appropriated $50,000 to the American Legion to defray the expenses of holding their national convention in Milwaukee. Sec. 51.38 (4) provides for state aids to nonprofit corporations operating day-care centers for mentally handicapped. State aids are provided for commitments to private tuberculosis sanitoriums and private insane asylums by secs. 58.06 (2) and 58.05 (2), and 50.04. Scholarship grants are provided in secs. 39.30 and 39.31 to aid Wisconsin residents in attending nonprofit public or private institutions of higher education in Wisconsin, some of which institutions are sectarian.

Other states have also used private institutions to attain a public purpose. We recognize that the out-of-state cases may be construing different constitutional

language, but they are interesting in evaluating what is the legitimate relationship between government and private agencies to attain public purposes. In respect to hospitals, the following courts have upheld the constitutionality of laws or other enactments subsidizing private agencies to carry on a public purpose. *Truitt v. Board of Public Works* (1966), 243 Md. 375, 221 Atl. 2d 370; *Lien v. City of Ketchikan* (Alaska 1963), 383 Pac. 2d 721; *Abernathy v. Irvine* (Ky. 1962), 355 S. W. 2d 159; *Kentucky Building Comm. v. Effron* (1949), 310 Ky. 355, 220 S. W. 2d 836; *Lazarus v. Board of Commissioners* (1966), 6 Ohio Misc. 254, 217 N. E. 2d 883. We think the basic concern of these courts in using the public, private or sectarian institutions, was a recognition of health as a public purpose and of the institution as a proper means of attaining the purpose.

School buildings and nursing education have also been the subject of approval. *Horace Mann League v. Board of Public Works* (1966), 242 Md. 645, 220 Atl. 2d 51, and *Opinion of the Justices* (1955), 99 N. H. 519, 113 Atl. 2d 114. The care and education of orphans, delinquents, and the elderly, is easily accepted as a public purpose and as requiring private agencies as proper means, especially in respect to the elderly. Grants in aid for these purposes to private institutions have been considered as fostering a public purpose without the requirement of very much control or supervision to see how the aid is spent. The operation and reputation of the institution seem to be sufficient. *Dunn v. Addison School* (1917), 281 Ill. 352, 117 N. E. 993; *Murrow Indian Orphans Home v. Childers* (1946), 197 Okla. 249, 171 Pac. 2d 600; *Schade v. Allegheny County Institution Dist.* (1956), 386 Pa. 507, 126 Atl. 2d 911; *Community Council v. Jordan* (1967), 102 Ariz. 448, 432 Pac. 2d 460.

At least five states now provide support to 16 nonmedical or about one third of the nonstate operated schools.

Florida subsidizes the University of Miami to the extent of $4,500 per student who is a resident of Florida. Pennsylvania, in effect, pays the deficit of Temple University, the University of Pittsburgh, and the Pennsylvania State University, and pays a subsidy on a base of $3,900 per student to Hahnemann Medical College of Philadelphia, Jefferson Medical College ,of Philadelphia, the University of Pennsylvania School of Medicine, and Woman's Medical College of Pennsylvania. North Carolina grants a subsidy of $2,500 for each student who is a resident of that state to Duke University School of Medicine and Bowman Gray School of Medicine of Wake Forest University. Ohio grants a subsidy of about $4,900 per student to Case Western Reserve University School of Medicine. The state of New York subsidizes all private colleges and universities. The average for a doctor's degree is about $2,000. There are six private medical schools in New York: Albany Medical College of Union University, Columbia University College of Physicians and Surgeons, Albert Einstein College of Medicine of Yeshiva University, New York Medical College, New York University School of Medicine, and the University of Rochester School of Medicine and Dentistry. *See* Exhibit 6, brief of State Medical Society of Wisconsin.

*Does ch. 3, Laws of 1969, violate art. X, sec. 6*
*of the Wisconsin Constitution?*

Art. X, sec. 6 of the Wisconsin Constitution [3] requires the legislature to establish a state university and to connect it with such colleges "as the interests of education may require." The respondent contends an appropriation to the medical school is to support a private educational

---

[3] "Provision shall be made by law for the establishment of a state university at or near the seat of state government, and for connecting with the same, from time to time, such colleges in different parts of the state as the interests of education may require. . . ."

institution and such support is impliedly forbidden because the legislature is mandated under sec. 6 to establish a state educational system for higher learning. It is argued that because the maxim *expressio unius est exclusio alterius* has been held to apply to art. VIII, sec. 5, which mandates the legislature to provide for an annual tax sufficient to defray the expenses of the state, it must be applied to sec. 6. The case of *State ex rel. Garrett v. Froehlich* (1903), 118 Wis. 129, 94 N. W. 50, is typical of the cases holding art. VIII, sec. 5 must be construed as exclusive. *See also State ex rel. New Richmond v. Davidson* (1902), 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067.

The maxim is not applicable to sec. 6. The provisions of this section are not so much a grant of power as a mandate for the exercise of an inherent power which the legislature had. Nor do we read sec. 6 as necessarily implying the creation of an exclusive system of higher education. In respect to art. X sec. 3, which required the legislature to provide free education for persons between the ages of four and twenty, this court held this section carried no implied prohibition which would prevent free education beyond the ages specified but only a mandate to provide free education for persons within those ages. We stated "The purpose was not to grant a power to the legislature to establish schools, for this power would exist without grant, but to compel the exercise of the power to the extent designated. An implied prohibition cannot be construed out of such materials." *Manitowoc v. Manitowoc Rapids* (1939), 231 Wis. 94, 98, 285 N. W. 403; *see also State ex rel. Dudgeon v. Levitan* (1923), 181 Wis. 326, 339, 340, 193 N. W. 499.

The concurring opinion in *Curtis' Administrator v. Whipple, supra,* by Mr. Justice PAINE and the dissenting opinion in *State ex rel. Wisconsin Development Authority v. Dammann, supra,* by Mr. Justice FOWLER, represent a viewpoint which was rejected by the later reasoning in *Manitowoc v. Manitowoc Rapids, supra.* Respondent re-

lies on *State ex rel. Wisconsin Lutheran High School Conference v. Sinar* (1954), 267 Wis. 91, 65 N. W. 2d 43, but that case is not helpful. Certainly, public education is a concern of the state and the operation of public schools to attain that end is a governmental function; but it does not follow that education of the public by a private institution is necessarily a private matter and is not endowed with public concern and interest. In *Sinar* a doubtful distinction was made for the purpose of a zoning ordinance that a public high school could be included and a Lutheran private high school could be excluded from a residential area. This distinction does not require art. X, sec. 6 to prohibit the use of a private school as a means to secure a governmental purpose. Nor do we think that *Costigan v. Hall* (1946), 249 Wis. 94, 23 N. W. 2d 495, 24 N. W. 2d 408, is in point. The question here presented was expressly not decided. All that case held was that sec. 40.34 (2), Stats., not a constitutional provision, did not authorize the bussing of pupils to a parochial or private school when the school district suspended a public school. We conclude ch. 3, Laws of 1969, does not violate art. X, sec. 6 of the Wisconsin Constitution.

*Does ch. 3, Laws of 1969, violate art. VIII, sec. 10 of the Wisconsin Constitution?*

Art. VIII, sec. 10 of the Wisconsin Constitution [4] prohibits the state from creating debts for works of internal improvement or being a party to the carrying on of such work. Sixty-seven years ago in *State ex rel. Jones v. Froehlich* (1902), 115 Wis. 32, 38, 91 N. W. 115, this court defined "internal improvement" in the concept of that day as "those things which ordinarily might, in human experience, be expected to be undertaken for

---

[4] "The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works; . . ."

profit or benefit to the property interests of private promoters, as distinguished from those other things which primarily and preponderantly merely facilitate the essential functions of government." This definition is not mutually exclusive. Assuming the first part of the definition still has validity, it would not apply to Marquette School of Medicine because the school does not exist for the profit or benefit of property interests of private promoters. The medical school is a nonprofit corporation, has no members or stockholders but only a board of directors. It is not brick or mortar but an institution which has an annual operating deficit of over one million dollars. One would not, in ordinary human experience, expect private promoters today to establish and operate a medical school for profit.

We think the second part of the definition has validity in excluding those improvements which are used by and for the state in the performance of its governmental function. The type of improvements and the nature of the structures change as time goes on and the functions of government increase and expand. Under this reasoning, the state has constructed many buildings for the university, a state office building, and many other-purpose buildings. *State ex rel. Thomson v. Giessel* (1955), 271 Wis. 15, 72 N. W. 2d 577; *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 147 N. W. 2d 304; see *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 60 N. W. 2d 873. We need not now decide whether the construction of a building for Marquette School of Medicine is a work of internal improvement, because all that is involved here is an appropriation for operating expenses. The state funds are appropriated for medical education, teaching, and research; and promotion, research and educational activities we have held are not internal improvements. *State ex rel. Wisconsin Development Authority v. Dammann, supra,* page 191.

*Does the appropriation violate art. I, sec. 18 of the*
*Wisconsin Constitution and the first amendment*
*of the United States Constitution?*

It is contended by the respondent that the appropriation to the medical school benefits a religious society because: (1) Marquette School of Medicine is a sectarian institution, and (2) prohibited benefits accrue to Marquette University which is a sectarian or religious institution. It may be assumed that Marquette University is a religious or sectarian institution, but there is no factual basis for concluding that the medical school, as now organized, is a religious institution, regardless of what tests might be used for such a determination. Marquette School of Medicine is a nonprofit corporation organized under ch. 181, Stats. Any association with Marquette University was eliminated in September of 1967. While it retains the name "Marquette," it has dropped the word "University" and has ceased to operate as a department of the university. Also eliminated in its articles of incorporation were the requirements that the medical school be operated in harmony with the fundamental, ethical and educational principles established by Marquette University. The president of Marquette University no longer appoints the faculty of the medical school and the university has no power to discharge any member of the medical faculty. Also eliminated is the provision that assets of the medical school would revert to Marquette University upon dissolution. The articles now provide that these assets will revert to an organization consistent with the purposes for which the medical school is now organized and in accordance with ch. 181.

All reference to Marquette University has been eliminated in the medical school's articles and the school is now empowered to establish its own standards and confer degrees. The board of directors no longer consists of any persons connected with Marquette University. Of its 16 members, seven are Protestant, five are Catholic, and

three are Jewish. Of its faculty, four of its six deans are Protestant, one is Catholic, one is Greek Orthodox. Nine of the 17 department heads are Protestant, three are Catholic, three are Jewish, and two are not affiliated with an organized religion. Fifty-one percent of the 279 full-time faculty members are Protestant, 33 percent are Catholic and 16 percent are Jewish. The student's religion or lack of it is unknown to the admission committee of the school. Religion is not taught in the medical school but various ethical creeds and religious faiths are considered in seminars in relation to the practice of medicine. This is not a study of religion but even if it were so considered, the constitutions were not intended to prohibit the academic study of religion. *See* Katz, *Religious Studies in State Universities,* 1966 Wis. L. Rev. 297. The purpose of the medical school is to teach medicine.

Thus when we consider stated purposes and practices, the makeup of its governing board, faculty and student body, the content of its teachings, and its relationship with a religious organization, as relevant factors, Marquette School of Medicine is nonsectarian. These factors, while not exclusive, have legal significance in determining the nature of an institution. *See Horace Mann League v. Board of Public Works* (1966), 242 Md. 645, 220 Atl. 2d 51.

It is true there is a relationship between the medical school and Marquette University in the form of a joint program for some graduate study but the medical school also has joint programs and services with five other institutions: The Milwaukee County General Hospital, owned and operated by Milwaukee County; Milwaukee Children's Hospital, owned and operated by a nonprofit corporation devoted to care of children; the Veterans' Administration Hospital, a unit of the federal system; Milwaukee Psychiatric Hospital, owned by a private foundation; and the Curative Workshop of Milwaukee, Inc., a nonprofit corporation devoted to mental and

physical rehabilitation and supported by the United Fund.

The joint program with the Marquette University involves graduate courses taught by the medical school faculty for students enrolled in Marquette University. Such teaching of graduate courses is essential and necessary to a medical school. No modern medical school can maintain a basic science department and keep its science faculty unless graduate programs are also conducted. The highly qualified teachers on the staff will not remain if their teaching efforts are restricted to undergraduate science courses for conventional medical school education. The service performed by the medical school is not free to graduate students of Marquette University but is paid for by a proration of tuition.

There are other minor connections such as a joint medical-dental library and the sharing of costs of teaching medical technology and physical therapy. At most, by way of argument, this is an incidental benefit to Marquette University. But it is argued that even an incidental benefit from the conduct of the joint programs is sufficient to be violative of art. I, sec. 18 of the Wisconsin Constitution. Respondent relies on *State ex rel. Reynolds v. Nusbaum* (1962), 17 Wis. 2d 148, 115 N. W. 2d 761, for the proposition that the primary-effect test adopted under the first amendment of the federal constitution by the United States Supreme Court has been rejected in Wisconsin. To violate the establishment clause of the first amendment, the purpose or primary effect of the legislation must be either the advancement or the inhibition of religion. This primary-effect test was first announced in *Everson v. Board of Education* (1947), 330 U. S. 1, 67 Sup. Ct. 504, 91 L. Ed. 711, and reiterated in *Abington School Dist. v. Schempp* (1963), 374 U. S. 203, 222, 83 Sup. Ct. 1560, 10 L. Ed. 2d 844, and *Board of Education v. Allen* (1968), 392 U. S. 236, 243, 88 Sup. Ct. 1923, 20 L. Ed. 2d 1060.

We find nothing in *Nusbaum* inconsistent with the primary-effect test. On the contrary, the court was of the view the primary effect was a benefit to private schools rather than the declared legislative purpose that school-bus rides were for the safety of children. The majority of this court rationalized that because school-bus service to parochial schools was not a governmental function, *i.e.*, "an educational objective," no benefit could be permitted to accrue to a private school. Granting that art. I, sec. 18 of the Wisconsin Constitution is more prohibitive than the first amendment of the federal constitution, it does not follow and we cannot read sec. 18 as being so prohibitive as not to encompass the primary-effect test. In the case before us, the primary effect of the legislation is not the advancement of religion but the advancement of the health of Wisconsin residents.

### *Does ch. 3, Laws of 1969, violate art. IV, secs. 31 and 32 of the Wisconsin Constitution?*

It is contended that the appropriation violates paragraph 7th, art. IV, sec. 31 of the Wisconsin Constitution,[5] which prohibits the legislature from enacting any special or private law for the granting of corporate powers or privileges. It is also contended that art. IV, sec. 32,[6] is violated, because ch. 3, Laws of 1969, is not a general law because it applies only to one corporation. We need not consider sec. 32 because if there is no violation of sec. 31, sec. 32 is not applicable. Early authorities in Wisconsin construed the constitutional prohibition to relate only to the grant of a corporate charter for the creation of

[5] "The legislature is prohibited from enacting any special or private laws in the following cases: . . .

"7th. For granting corporate powers or privileges, except to cities."

[6] "The legislature shall provide general laws for the transaction of any business that may be prohibited by section thirty-one of this article, and all such laws shall be uniform in their operation throughout the state."

corporate powers and privileges or the addition of charter powers to an existing corporation. *See Attorney General v. Railroad Companies* (1874), 35 Wis. 425; *Black River Improvement Co. v. Holway* (1894), 87 Wis. 584, 59 N. W. 126. But respondent contends the constitutional restriction should now be construed more liberally to prohibit the grant by special act to a corporation of any power or privilege which it can exercise in fact under its general corporate powers and is essential to its corporate existence.

However, in *In re Southern Wisconsin Power Co.* (1909), 140 Wis. 245, 258, 122 N. W. 801, this court pointed out that a franchise (the right to build a dam which was later assigned to a corporation) granted by the legislature was not a grant of corporate power or privilege within the meaning of art. IV, sec. 31, and did not require a corporate existence for its exercise. It is argued that the grant of funds to Marquette School of Medicine confers the power and privilege to use state funds in its operation and a substantial appropriation may even save its corporate life because the medical school is now operating at a deficit. This argument is a play on words. The appropriation is a grant of funds, not of corporate power or privilege. Sec. 31 prohibits only the special creation or grant of corporate existence with powers to act as a corporation in respect to those powers and privileges and the special granting of additional powers to be exercised in a corporate capacity.

We make it clear that our determination that the present minimal budgetary and financial controls are sufficient to sustain the proposed 1969 appropriation does not necessarily constitute a determination that continued appropriations with no greater controls than presently established by the law would have this court's constitutional approval.

*By the Court.*—Chapter 3 of the Laws of 1969 is valid and constitutional and respondent is ordered to honor its appropriation.