IN RE ESTATE OF GANSER, Deceased: MADISON GENERAL
HOSPITAL MEDICAL & SURGICAL FOUNDATION, INC.,
Appellant, v. VOLZ, and others, Respondents.

*No. 75–609. Argued June 1, 1977.—Decided July 1, 1977.*
(Also reported in 255 N. W. 2d 483.)

182

For the appellant there were briefs by *S. R. Stroud, C. Vernon Howard, Ronald W. Todd* and *Stroud, Stroud, Willink, Thompson & Howard,* and oral argument by *Ronald W. Todd,* all of Madison.

There was a joint brief by *Ray J. Aiken* and *Patrick K. Hetrick* of Milwaukee, for Marquette University, with oral argument by *Mr. Hetrick; T. Michael Bolger* and *Darryl S. Bell* of Milwaukee, for Medical College of Wisconsin, with oral argument by *Mr. Bolger;* and *Quarles & Brady* of Milwaukee, of counsel.

HANLEY, J. Two issues are presented on appeal:

1. What was the intention of the testatrix, Alma Ganser, in making the bequests in Clause SEVENTEENTH of her will?

2. Does an award to the respondents constitute an improper application of the doctrine of *cy pres?*

*Intent of Testatrix*

The paramount object of will construction is the ascertainment of the testatrix's intent. *Estate of Farber,* 57 Wis.2d 363, 368, 204 N.W.2d 478 (1973); *Estate of Southey,* 26 Wis.2d 335, 338, 132 N.W.2d 532 (1965). This intent is determined from the language of the will itself, considered in light of the circumstances surrounding the testatrix at the time of the will's execution. *In re Trust of Pauly,* 71 Wis.2d 306, 316, 237 N.W.2d 719

(1976) ; *In re Trust of Bowler,* 56 Wis.2d 171, 176, 201 N.W.2d 573 (1972).

Since the language of the will is the best evidence of the testatrix's intent, the court will look to it first, and if there is no ambiguity or inconsistency in the will's provisions, there is no basis for interpretation of the language used or a determination as to the testatrix's actual intent. *Estate of Naulin,* 56 Wis.2d 100, 104, 201 N.W.2d 599 (1972). If, however, an ambiguity exists in the language of the will, reference may then be made to the surrounding circumstances at the time of its execution. If, after such reference, the testatrix's meaning is clear, no further inquiry is necessary. *Estate of Gehl,* 39 Wis.2d 206, 213, 159 N.W.2d 72 (1968). When an ambiguity still persists after consideration of the surrounding circumstances, resort may finally be had to the rules of will construction and extrinsic evidence. *Estate of Mangel,* 51 Wis.2d 55, 65, 186 N.W.2d 276 (1971).

Language is said to be ambiguous when it is subject to two or more reasonable interpretations. "A latent ambiguity exists where the language of the will, though clear on its face, is susceptible of more than one meaning when applied to the extrinsic facts to which it refers." *Estate of Gibbs,* 14 Wis.2d 490, 496, 111 N.W.2d 413 (1961).

In the instant case, a change in circumstances, the severance of formal ties between the University and the Medical College, has occurred since the execution of the will. While there is certainly no question, under the language of the will, as to what the testatrix intended under the circumstances which existed at the time it was executed, the will gives no clear indication as to her intent in the event this particular change in circumstances would take place. The parties' opposing interpretations of

Clause SEVENTEENTH, relating to whether the Medical College is "its [the University's] Medical School" and whether the University is "unable" to accept the bequest, considered in light of the 1967 separation of the University and the Medical College, are both reasonable, and it may not be doubted that a latent ambiguity exists.

This case, therefore, turns on the determination of Mrs. Ganser's intent in making the bequest in Clause SEVENTEENTH. The trial court accepted the respondents' contention that the testatrix's intent was "to benefit medical education at the post-graduate level under the aegis of Marquette University in the context of Marquette's educational and philosophical principles." The appellant, on the other hand, argues that the testatrix's intent was to benefit a medical school which was a part of the University, her and her deceased husband's *alma mater*, a private, sectarian institution, the fundamental religious principles of which were of great importance to her.

Consideration of the circumstances surrounding this bequest convinces this court that the Medical College, despite the formal separation from the University, constitutes "its [the University's] Medical School" within the intent of the testatrix, Alma Ganser. The predecessor of the Medical College originated in 1907 when Marquette University and the Milwaukee Medical College joined to create the Medical Department of Marquette University. In 1911, Mrs. Ganser graduated from the Marquette University School of Nursing. When the University acquired the assets of the Wisconsin College of Physicians and Surgeons in 1913, the medical department became the Marquette University School of Medicine. Mrs. Ganser's husband, William J. Ganser, M.D., who predeceased his wife, was a 1913 graduate of the Marquette University School of Medicine. Throughout their lifetimes, Dr. and Mrs. Ganser were active members of the Roman Catholic Faith and made the Uni-

versity and the Marquette University School of Medicine the object of their beneficence, making gifts of not less than $100 on at least eleven occasions from 1939 to 1964.

In 1918 the Marquette University School of Medicine was incorporated and since that time has always been a legal entity separate from, although affiliated with, the University. The Medical College and the University have also since that time maintained separate assets and accounting systems.

Prior to 1967, the Medical College operated under Articles of Association which stated the Medical College formed a department of the University. The Articles further provided "that there shall be no deviation from the fundamental, ethical and educational principles established by said Marquette University." Under the Articles, the president of the University was president of the Medical College and an ex officio member of the board of directors of the Medical College; officers of the University and one person nominated by the trustees of the University served as members and directors of the Medical College; the president of the University had the power to appoint Medical College faculty; and the directors of the University had the power to discharge faculty members for breaches of the fundamental, ethical and educational principles established by the University. In addition, it was provided that if the Medical College failed to perform the function for which it was organized, all of its assets would be transferred to the University.

By the adoption of Restated Articles of Incorporation in 1967, the Medical College served all of the above-mentioned ties with the University, eliminating all control which the University had over the Medical College. The Medical College, while always legally separate from the University, became academically independent as well.

The Medical College and the University have, however, continued to maintain cooperative joint medical and

medically related programs in the basic sciences, benefiting both graduate and undergraduate students. These cooperative efforts include the medical library and programs in physical therapy, medical technology, immunology, biomedical engineering and bionuclear medicine. The Medical College continues to be physically located where it always has been, upon the University campus in the Cramer Building, which is owned by the University and leased to the Medical College.

In light of all of the above circumstances, we hold that the 1967 separation between the University and the College did not alter those aspects of the relationship which motivated Mrs. Ganser to refer to the Medical College as "its" [the University's] Medical School. The appellant contends that the word "its" was used by the testatrix to identify an association between the University and the Medical College by which the University controlled the Medical College or by which the Medical College was a department of the University. It is further contended that it was Mrs. Ganser's intent that if such an association did not exist, the corpus should pass to the appellant by the gift over provision.

The meaning of the words of a will, however, are to be ascertained subjectively. The court does not seek to determine what the usual or dictionary usage of a word may be, but rather the testatrix's individual meaning. *Estate of Gehl, supra* at 211.

The separation between the University and the Medical College only eliminated one component of their relationship, that of control of the Medical College by the University. Other important components remain. The separation involved here could not destroy the parental aspect of the University's relationship with the Medical College,

which was originated by the University over sixty years before the separation. The Medical College has always been physically situated on the campus of the University, and the two institutions continue to cooperate in joint medical and medically related programs. These unchanged aspects of the relationship are very significant in light of the fact both Mrs. Ganser and her husband graduated from the University during the period in which the University created the Medical College. Dr. Ganser graduated from the Medical College's predecessor in the first year, 1913, that it was formally a school of medicine. It is perfectly reasonable that an old alumnus such as the testatrix, who was certainly aware of the historical association between the University and the Medical College, would, even after the 1967 separation, still refer to the Medical College as the University's medical school.

This case is very similar to *Estate of Southey, supra*, wherein the will of the testatrix, Miss Southey, contained the following bequest and the following gift over clause:

" 'a. one-half (½) thereof to Mrs. Louise Baker, in the event that the relationship of employee and employer exists between her and me at the time of my death and that she is actually and actively engaged in the performance and discharge of her duties as housekeeper to me under such employment at the time of my death;

" 'In the event that the said Mrs. Louise Baker, at the time of my death, does not sustain the relationship of employee to me and is not then actively and actually engaged in the performance and discharge of duties as my housekeeper, the share of my residuum so bequeathed to her shall be distributed pro-rata to and among the other residuary legatees of my estate.' " *Id.* at 336.

Miss Southey died in 1962. For the period from 1952 to 1960, Mrs. Baker had served as Miss Southey's housekeeper and companion, receiving a weekly salary. In 1960, Miss Southey suffered a serious stroke and was

subsequently placed under a guardianship and moved to a nursing home. She was incompetent until her death. During the two years from 1960 to 1962, Mrs. Baker continued to serve as a personal attendant and was paid by the guardians for this service. The residuary legatees, however, contended that Mrs. Baker could not be considered Miss Southey's housekeeper because there was no house to keep and also that Mrs. Baker was not employed by Miss Southey, but rather by the guardians.

In *Southey* this court held that while if the terms of the will were interpreted literally, Mrs. Baker could not receive the bequest, it was Miss Southey's intent that Mrs. Baker receive the bequest if she served in the same fashion as she did at the time the will was executed. Having done so, she was entitled to the bequest.

The instant case includes a similar change of circumstances in relation to the status of the legatee, and as in *Southey* that change is not of such a nature that it appears the testatrix did not intend the legatee to receive the bequest under the circumstances. Furthermore, while in *Southey* the condition imposed by the testatrix was clear and definite, in this case the condition imposed, if any is imposed, is very indefinite, based solely on the word "its." Actually, there is nothing to indicate Mrs. Ganser intended the word "its" to be as restrictively interpreted as the appellant contends.

The appellant's reliance upon this court's opinion in *State ex rel. Warren v. Reuter,* 44 Wis.2d 201, 170 N.W.2d 790 (1969) is misplaced. In that case the court evaluated the relationship between the University and the Medical College for the purpose of determining whether a state appropriation to the Medical College was constitutional in light of the establishment of religion clauses in art. I, sec. 18 of the Wisconsin Constitution and the First Amendment of the United States Constitution. The court

held in *State ex rel. Warren* that the 1967 separation was complete for the purposes of this constitutional issue. In the instant case, however, the court only seeks to determine Mrs. Ganser's intent. A finding in favor of the University here does not result in the University having it both ways, as the appellant contends, for in this case, it is the intent of the testatrix, not the University, which is effectuated.

Therefore, it is concluded that despite the 1967 separation, the Medical College constitutes "its [the University's] Medical School" within the meaning intended by Mrs. Ganser. The University is, accordingly, able to accept the bequest.

An agreement of administration of bequest between Marquette University and the Medical College of Wisconsin was executed on January 15, 1974. No issue has been raised as to the validity of that agreement. Therefore, the court does not pass upon the question of the validity of the agreement of administration in relationship to the testatrix's intent as between those two respondents.

*Cy Pres Doctrine*

Although all parties agree that the *cy pres* doctrine is inapplicable in this case, the appellant argues that the trial court improperly applied it. It is the appellant's contention that if the respondents receive the bequest, the doctrine of *cy pres* would thereby be improperly applied. This contention is not correct.

The doctrine of *cy pres* is accurately stated in the Restatement (Second) of Trusts, sec. 399 (1959).

"If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general in-

tention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor."

Under *cy pres* a court's award is made after a determination that it is impossible or impracticable to carry out the particular charitable purpose of the bequest. In the instant case, however, the trial court's conclusion and the conclusion reached above do not involve a determination that the testatrix's particular charitable purpose cannot be carried out, but rather involve the direct effectuation of her particular intent as determined from the language of the will interpreted in light of the surrounding circumstances. The doctrine of *cy pres* has not been applied.

*By the Court.*—Judgment affirmed.