WISCONSIN SOLID WASTE RECYCLING AUTHORITY, Petitioner, v. EARL, Secretary, Department of Administration, Respondent.

*No. 75–52. Argued September 2, 1975.—Decided November 25, 1975.*

(Also reported in 235 N. W. 2d 648.)

468

For the petitioner there were briefs by *Quarles & Brady*, attorneys, and *Laurence C. Hammond, Jr., Michael J. Spector* and *Ronald E. Klipsch* of counsel, all of Milwaukee, and oral argument by *Mr. Hammond*.

For the respondent there were briefs by *Godfrey & Kahn, S. C.*, attorneys, and *Jospeh M. Bernstein, William H. Alverson* and *James Ward Rector* of counsel, all of Milwaukee, and oral argument by *Mr. Alverson* and *Mr. Rector*.

WILKIE, C. J.   This action calls for a declaration of rights in regard to the Wisconsin Solid Waste Recycling

Authority enactment of the 1973 legislature. We affirm the constitutionality of that legislation and order an injunction issued directing Anthony S. Earl, Secretary, Wisconsin Department of Administration, to honor petitioner's request for funds implementing this legislation.

In this declaratory judgment action, the petitioner, the Wisconsin Solid Waste Recycling Authority, seeks a declaration that:

1. The Authority is a public body corporate and politic legally and validly created and existing pursuant to ch. 305, Laws of 1973; that all notes and bonds issued by the Authority in accordance with applicable procedures are valid and enforceable obligations of the Authority; and that the purposes to which the proceeds of the Authority's debt may be applied are lawful purposes;

2. the provisions of the act are consistent with all provisions of the Wisconsin and United States Constitutions; and

3. the secretary is legally obligated to issue a warrant for the $500,000 appropriated to the Authority by secs. 2 and 3 of the act.

The basic facts are all stipulated by the parties. In February of 1972, in response to a request from the governor, a Recycling Task Force submitted a feasibility report which was followed in May of 1973 by a predesign engineering report, both of which reports included recommendations and possible plans for a solid waste recycling program for the state. The task force and the board of engineering consultants, which authored the predesign report, found, among other things, that waste quantities are rapidly increasing. For example, waste quantities (exclusive of agriculture and mining wastes) for the entire state are estimated at 12,825 tons per day in 1975, and 17,200 tons per day in 1985. Further, disposal costs are increasing and disposal sites are more difficult to

obtain. The board report includes information (based on a report made to Congress by the Environmental Protection Agency) that if recycled materials were used in the production of steel, for example, there could be a 90 percent reduction in the amount of virgin materials consumed, a 40 percent reduction in the amount of water used, a 74 percent reduction in energy consumed, an 86 percent reduction in air pollution, and a 76 percent reduction in water pollution.

The legislature responded to the recommendations of the task force, board, and governor by enacting ch. 305, Laws of 1973 (hereinafter the act), effective June 19, 1974, creating and granting powers to the Wisconsin Solid Waste Recycling Authority. The act is an additional step in a series of determinations by the legislature that the problems of solid waste and environmental control are matters of statewide concern which deserve legislative attention. This attention was evidenced by the authority given to the Department of Natural Resources by ch. 83, Laws of 1967, to implement a program of solid waste management, by secs. 59.07 (135) and 144.435, Stats., giving counties the power to establish solid waste management plans, and by the Wisconsin Environmental Protection Act, sec. 1.11.

According to the stipulated facts, the basic outline of the provisions of the act is as follows:

"**A. Organization.**
"The Authority is a 'public body corporate and politic' consisting of seven members appointed by the Governor with the advice and consent of the Senate for staggered six-year terms. One member must be recommended by the County Boards Association, one member by the League of Municipalities and a third member by the Towns Association. The Authority may not employ more than 40 persons. No law terminating the existence of the Authority shall take effect while the Authority has obligations outstanding. The Authority has a continuing legislative appropriation of $500,000 for general program

operations. This appropriation is to be repaid to the State general fund from the Authority's surplus, if any, as is determined pursuant to agreement between the Authority and the Secretary. The annual administrative costs for the Authority shall not exceed $600,000. See Sections 2 and 3, Chapter 305 and Sections 499.02, 499.073, 499.335, Wis. Stats.

"B. General Jurisdiction and Limitations.

"As set forth in Section 499.07, the Authority has all powers necessary or convenient to carry out and effectuate the purposes of the Act, inlcuding without limitation, the power to adopt and publish rules, to coordinate all solid waste recycling activities within recycling regions, to sell or market the products and by-products of recycling facilities, to acquire, construct, develop and operate recycling facilities, to conduct necessary hearings and investigations and to appoint state and local advisory councils. The Authority has no jurisdiction or power to collect or purchase solid wastes. In general, it can accomplish its purposes through virtually any type of contractual arrangement with private persons or other public entities, as well as through its own personnel, subject in some but not all cases to competitive bidding requirements. The Authority is required to utilize private industry to the maximum extent feasible to perform planning, design, management, construction, operation, manufacturing and marketing functions related to solid waste disposal and recycling and to assist in the development of industrial enterprise based on recycling.

"No person may acquire, construct, alter, reconstruct or operate a municipal solid waste recycling facility within a region established by the Authority without prior consultation with the Authority. Facilities owned or used by the Authority are exempted from all municipal ordinances except zoning ordinances. The Authority has no jurisdiction with respect to solid waste disposal or recycling facilities in areas of the state outside the regions then established by the Authority.

"The Authority is required to afford municipalities cooperation in the transition from municipal management of solid waste to recycling in regions which are established by the Authority, and is required to provide assistance to the Department of Local Affairs and De-

velopment and the DNR in carrying out their statutory responsibilities under Section 144.435. Further, upon establishment of operating facilities in regions established by the Authority, the Authority is required to purchase certain municipal solid waste disposal facilities upon offer by a municipality.

"The Board of Engineering Consultants estimated that the total capital costs of a state-wide program of regional recycling systems would be approximately $120,000,000, in terms of 1973 dollars.

"The actions and activities of the Authority and its contractors must conform to policies and rules of the DNR. The Authority's user rates, charges and rentals are subject to approval by the Public Service Commission. In addition, the Authority is required to consult with the Wisconsin Building Commission prior to constructing any solid waste recycling facilities or contracting for the use of private solid waste recycling facilities; is required to obtain the approval of the Secretary for its system of accounts; and is required to provide a semiannual report to the Joint Committee on Finance and an annual report to the Governor, the Chairman of the Joint Committee on Finance and the Secretary. Such annual report will describe the Authority's operations and accomplishments, income and expenses, recycling costs as compared to nonrecycling disposal costs and the extent to which materials recovered alleviated shortages or reduced demands on virgin or irreplaceable raw materials, contributed to an energy balance, and improved the environment. Such report shall also contain the Authority's suggestions as to legislation and other measures to reduce the volume of solid waste generated in Wisconsin.

"See generally Sections 9, 10, Chapter 305; Sections 499.01 (3), (8), (10), 499.03, 499.07 (1), (5), (8), (14), (20), (21), (24)–(30), 499.075, 499.08, 499.085–.087, 499.09, 499.12–.13, 499.15, 499.19–.20, 499.40, 499.45.

## "C. Authority Bonds.

"The Authority is authorized to incur debts and to issue notes and bonds to, among other things, meet the cost of acquiring, constructing, improving or extending solid waste recycling facilities. See Sections 499.07 (12), (13), (14), 499.25. The notes and bonds of the Authority

may be sold by the Authority at public or private sale at the price determined by the Authority. See Sections 499.26 and .27. However, the Authority shall not have outstanding at any one time notes and bonds for any of its corporate purposes in an aggregate principal amount exceeding $16,500,000, and must consult with and coordinate the issuance of bonds with the State Bond Board prior to the issuance of any bonds. See Section 499.34.

"The Act states that notes and bonds of the Authority are obligations of the Authority only. It specifically provides that the state shall not be liable on the Authority's notes and bonds, that such notes and bonds shall not be a debt of the state, and that all of the Authority's notes and bonds shall contain a statement to such effect on the face thereof. See Section 499.31. In Section 499.35, the state has pledged to the holders of any notes or bonds issued by the Authority that the state will not limit or alter the rights vested in the Authority to fulfill the terms of any agreements made with the holders. The Authority is authorized to include this pledge of the state in any agreement with the holders of the notes or bonds. The Act also states that no law terminating the Authority shall take effect while the authority has obligations outstanding.

"The Authority is required to establish a 'capital reserve fund' to secure its notes and bonds in an amount specified by the statute. It may not issue bonds if, after issuance, the 'capital reserve fund requirement' would exceed the amount of the capital reserve fund. The 'capital reserve fund requirement' equals the maximum, total amount of debt service to be paid by the Authority in any one succeeding year of those then shown on its debt amortization schedule, less the sinking fund provision theretofore made for such succeeding year plus the sinking fund accretion for the current year. If at any time the capital reserve fund requirement exceeds the amount of the capital reserve fund, the chairman of the Authority is required to certify to the Secretary, the Governor, and the Joint Committee on Finance the amount necessary to restore the capital reserve fund to an amount equal to the fund requirement. In even-numbered years, and prior to the completion of the budget compilation under Section 16.43, the Secretary *shall* in-

clude that certified amount in the budget compilation. In any case, the Joint Committee on Finance *shall introduce* in either house in bill form an appropriation of the amount so certified to the capital reserve fund of the Authority. The Act expresses the legislature's recognition of a moral obligation to make such appropriation and its expectation and aspiration that, if ever called upon to do so, it shall make such appropriation. [Footnote omitted.] The Authority is required to pay into the capital reserve fund any moneys appropriated therefor by the legislature. See Section 499.32.

### "D. Charges for Services.

"The Authority is required to establish rates and collect charges and rentals for services which it provides (or contracts with private parties to provide). To determine the rates, charges and fees for a region, the Authority is required to estimate the costs of operating the region, the cost of debt service in the region and the revenue to be derived from the sale of recoverable products. The difference between the estimated costs and revenues shall be the basis for determining the rates, charges and rentals for the Authority's services. The rates, charges and rentals so established are subject to approval by the Public Service Commission. Section 499.11.

"The Authority is required to include its anticipated rates, charges and revenues in region plans submitted to public hearings pursuant to Section 499.10 (3)–(6).

"The schedules of rates and charges to be collected from all municipalities or private persons, firms or corporations served by facilities of the Authority or by private facilities contracted by it, in a region may be based upon any classifications or subclassifications which the Authority may determine to be fair and reasonable. Such schedules of rates and modifications of them are subject to approval by the Public Service Commission. See Section 499.11 (1) (b). During the first three years of operation in a region the schedules initially established may be reduced but not increased. The Authority may from time to time change the boundaries of existing regions and establish new regions, pursuant to Section 499.10. The Authority's cost and revenue accounting procedures are to be applied uniformly to all recycling

regions. There is no requirement that rates, charges and fees of the Authority be uniform as between regions.

## "E. Establishment of Regions.

"The Authority has the power to establish recycling regions and provide for the establishment of boundaries therefor. See Section 499.07 (18). The general boundaries for the first three recycling regions are set forth in the Act. See Section 499.10 (1). Prior to the establishment or modification of region boundaries (or substantial modification of the region plans for the initial regions under the statute) the Authority is required to prepare a detailed region plan describing the proposed boundaries, location of Authority facilities, anticipated volumes of wastes to be processed and financial projections. Copies of the plan are to be provided to the DNR, each regional planning commission having territory within the proposed region, the clerk of each municipality within the proposed region and selected public libraries. Further, a class 2 notice (Ch. 985, Stats.) must be published in newspapers having general circulation within the region. The Authority then must schedule public hearings on the plan within the region and provide notice of such hearings by mail and publication.

"The decision relating to the establishment or modification of region boundaries or the location of Authority facilities must be based upon the following criteria: maximum economic benefit to the Authority and affected municipalities from recycling of solid wastes; maximum enhancement and protection of the land, water and air resources of the state; and attainment of consistency with adopted plans of regional planning and state agencies. See Sections 499.10 (4) and (5). . . .

## "F. Required Use of Facilities.

"The Authority has the power to require 'any person capable of being effectively served by the facilities of the Authority' to make use of such facilities pursuant to Section 499.16. See Section 499.07 (17). The Authority shall require such use where it finds such use to be in the 'best public interest.' See Section 499.16 (1). 'Person' is defined by the Act as including individuals, partnerships, associations, corporations and municipalities. See Section 499.01 (7).

"The Authority must find such required use to be in the best public interest if this will result in reusable

materials being recovered rather than being disposed of, if required use will lessen the demand for sanitary landfill sites, if required use will result in a positive energy balance or conserve natural resources, or if required use is necessary to achieve operational volumes necessary to make the Authority financially self-supporting to the greatest extent possible. See Section 499.16 (2). However, the Authority cannot require the use of its facilities as to solid wastes produced by persons other than municipalities which are privately processed and reused. Section 499.16 (3). Section 499.01 (10), which defines 'solid waste,' provides that solid waste does not include materials privately processed for reuse.

"Prior to requiring the use of its facilities and services, the Authority must, on notice to persons affected, negotiate toward contractual agreements for required usage. If agreement is not reached within ninety (90) days after notice, the Authority must hold public hearings on the proposed required use.

### "G. Tax Exemption.

"The Authority is not required to pay any taxes or assessments upon or in respect of any property owned by the Authority, and the income of the Authority is free from taxation of every kind by the state and by political subdivisions of the state. The Authority is required to make reasonable payments for water, sewer and electric services, and for other municipal services provided to facilities of the Authority. See Section 499.17.

### "H. Condemnation Powers.

"The Authority has the power to acquire property for its purposes by condemnation under Chapter 32, Stats. . . . Sections 499.07 (19m), 499.072."

The members of the Authority were appointed by the governor on August 30, 1974, and those appointments were formally confirmed by the senate on November 20, 1974. The first meeting of the Authority was on September 11, 1974. Since that time, the members have elected a chairman and vice-chairman and adopted by-laws, a corporate seal and various policies.

By letter dated January 24, 1975, the Authority requested that the respondent, Secretary Anthony S. Earl,

of the Department of Administration, forward the $500,000 appropriation made by the legislature for initial operating expenses. By letter dated January 31, 1975, respondent refused to forward the allotment requested, based on the advice of counsel that various provisions of the act were unconstitutional. Respondent, in his pleadings, later abandoned several of his original assertions as to the unconstitutionality of certain elements of the act. However, petitioner requests that all possible challenges to constitutionality be addressed by this court in its deliberations on the matter, so that, should the relief requested be granted, the Authority will have full power to commence and continue its mandated operations.

The following issues are dispositive of the questions raised by this petition:

1. Is the purpose of the act both public and statewide?

2. Does the act create a state debt in violation of art. VIII, secs. 4 and 7, Wisconsin Constitution, or constitute a pledge of the state's credit in violation of art. VIII, sec. 3, Wisconsin Constitution?

3. Does the act grant an unreasonable exemption from taxation in violation of art. VIII, sec. 1, Wisconsin Constitution?

4. Do the required use, user charges and condemnation powers of the Authority violate the "home-rule" provisions of art. XI, sec. 3, Wisconsin Constitution?

5. Are the powers of the executive or the legislature unlawfully invaded by sec. 499.32 of the act, directing inclusion in the budget and presentation in bill form in the legislature of certified deficits in the capital reserve fund of the Authority?

6. Is the act a special or private law in violation of art. IV, secs. 31 and 32, or art. XI, sec. 1, Wisconsin Constitution?

7. Does the act involve the state in works of internal improvement in violation of art. VIII, sec. 10, Wisconsin Constitution?

8. Are certain of the powers granted to the Authority invalid as illegal delegations of legislative authority?

9. Are the regional divisions mandated by the act appropriate as classifications which are rational and related to the purposes of the act?

10. Does sec. 499.02 (4) of the act, providing that the Authority shall not be terminated while it has obligations outstanding, place an invalid restriction on the reserved power of the legislature to repeal enactments in violation of art. XI, sec. 1, Wisconsin Constitution?

In determining the constitutionality of a legislative enactment, we begin with the well-established presumption of constitutionality that is generated by all legislative enactments.[1] This court will find a legislative enactment unconstitutional only in the event that violation of a specific constitutional provision can be shown beyond a reasonable doubt, with all doubts to be resolved in favor of constitutionality.[2] Moreover, the validity of the legislation in light of specific provisions of the constitution, rather than its wisdom, is the only concern of this court.[3]

1. *The act is for public and statewide purposes.* Although no constitutional provision specifically directs the expenditure of public funds for public purposes only, such limitation is a "well-established constitutional tenet."[4] Failure to respect this limitation would be abhorrent to the constitution.[5]

The power to determine what constitutes a public purpose resides initially with the legislature.[6] "If any public

---

[1] *State ex rel. Hammermill Paper Co. v. La Plante* (1973), 58 Wis. 2d 32, 46, 47, 205 N. W. 2d 784.

[2] *Id.*

[3] *State ex rel. Warren v. Nusbaum* (1973), 59 Wis. 2d 391, 413, 208 N. W. 2d 780.

[4] *Hammermill, supra,* footnote 1, at pages 47, 48.

[5] *Nusbaum, supra,* footnote 3, at page 414.

[6] *Hammermill, supra.*

purpose can be conceived which might rationally be deemed to justify the act or serve as a basis for the instant expenditure, the test is satisfied."[7]

The determination of the legislature with respect to the existing condition of solid waste disposal facilities and the purpose for creation of the Authority is spelled out in some detail by sec. 1, ch. 305, Laws of 1973:

". . . It is found and declared that the people of this state have the right to a clean and wholesome environment; that prevailing solid waste disposal practices generally, throughout the state, result in unnecessary environmental damage, waste valuable land and other resources, and constitute a continuing hazard to the health and welfare of the people of the state; that local units of government and the private solid waste management industry are becoming hard pressed to provide adequate services at reasonable costs, without damage or hazard to the environment and the loss of useful resources; that locally organized voluntary recycling programs have shown that solid wastes produced in the state contain recoverable resources; that technology and methods now exist to dispose of solid wastes and recover resources with commensurate environmental benefits; that coordinated large-scale processing of solid wastes is necessary in order to achieve maximum environmental and economic benefits for the people of the state; that the amounts of solid waste being produced within the state are adequate to sustain such large-scale processing; that the geography and population density of the state are such as to enable and facilitate the effective and economic regional accumulation of solid wastes; that present patterns of governmental organization and the rapidly increasing cost of financing solid waste management facilities greatly limit the ability of local government and the private solid waste management industry to construct and operate the large-scale processing plants needed to maximize environmental and economic benefits; that the development of systems and facilities and the use of the technology necessary to initiate large-scale processing of solid wastes are logical and necessary

---

[7] *Nusbaum, supra.*

functions to be assumed by a state authority; that the provision of solid waste disposal services at reasonable cost, through a state authority, would supply valuable assistance to local units of government and the private solid waste management industry; that in establishing a Wisconsin solid waste recycling authority, the legislature is acting in all respects for the benefit of the people of this state to serve a public purpose in improving and otherwise promoting their health, welfare and prosperity and that the Wisconsin solid waste recycling authority, as created by this act, is empowered to act on behalf of the people of this state in serving this public purpose for the benefit of the general public; and that it is a valid public purpose to assist local units of government and the private solid waste management industry in providing the necessary systems, facilities, technology and services for solid waste management and resources recovery and to provide the necessary powers needed to accomplish these public purposes."

This language shows beyond any question that the legislature sought a plan in the area of solid waste disposal which would aid in alleviating the problems of rapidly increasing waste quantities, increasing disposal costs and difficulty in obtaining landfill sites, would reduce the amount of land needed for such sites, would reduce present disposal costs and provide future returns, would conserve natural resources and energy, and would protect and improve the environment. The attainment of these objectives is related closely to the safety, health, welfare and comfort of the residents of the state, maintenance or improvement of which is a well-settled public concern.[8] Moreover, recycling can be defined as a means of garbage collection and, as such, has been denominated

---

[8] *Nusbaum, supra,* footnote 3, at page 420; *State ex rel. Warren v. Reuter* (1969), 44 Wis. 2d 201, 214, 170 N. W. 2d 790; *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 397, 147 N. W. 2d 304.

as clearly a matter justifying expenditure of public funds.[9]

The provisions of the act seeking to promote development of private enterprise do not detract from its public purpose, since promotion of a private enterprise is a valid public purpose in itself, especially when any benefit to particular private businesses is an incidental corollary to the primary purpose.[10] Nor does the possibility that the Authority may be denominated a "private corporation" invalidate an appropriation to it for a public purpose.[11]

As for the requirement of statewide purpose, the promotion of public health and welfare has been recognized as a legitimate statewide concern.[12] The implementation of the act by region does not negate its fundamentally statewide nature in that it represents only a phased solution, to be expanded throughout the state as the requisite criteria contained in the act are met, rather than a benefit limited only to certain localities.

In view of the nature and provisions of the act, it is clear that its implementation will be for the public health, welfare, safety and comfort of the people of the entire state and, therefore, meets the constitutional requirement that expenditures be for public and statewide purposes only.

2. *The act does not create state debt.* Art. VIII, secs. 3, 4, and 7, Wisconsin Constitution, preclude creation of a state debt or pledge of the state's credit for certain purposes.

---

[9] *West Allis v. Milwaukee County* (1968), 39 Wis. 2d 356, 377, 159 N. W. 2d 36, certiorari denied.

[10] *Hammermill, supra,* footnote 1, at pages 52–57.

[11] *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 176, 277 N. W. 278, 280 N. W. 698.

[12] *Nusbaum, supra,* footnote 3, at page 422.

The provisions of the act, contained in secs. 499.25–499.41, Stats., regarding the financing of the programs of the Authority, are nearly identical to those of the Housing Finance Authority Act, ch. 287, Laws of 1971, creating ch. 234, secs. 234.01–234.43, the constitutionality of which was upheld in *Nusbaum*. Specifically, this court held in that case, as pertinent here, that no state debt or pledge of state credit exists unless there is an obligation which is legally enforceable against the state.[13] The act herein, as did the Housing Finance Authority Act in sec. 234.14, expressly prohibits the Authority to incur state debt or pledge state credit.[14]

The act makes additional provision, however, for a moral obligation on the part of the legislature to make up deficits and expresses the recognition of an "expectation and aspiration" that the legislature will appropriate funds to meet such deficits.[15] The petitioner asserts that this provision was included in reliance on this court's language in *Nusbaum*,[16] construing the provisions of the Housing Finance Authority Act as constituting an "expression of future intention or aspiration" and the subsequent amendment of the housing act to include a "moral obligation" clause.[17] This assertion seems entirely appropriate, in view of the extensive discussion of the housing authority financing plan in *Nusbaum* and the careful circumscription of the provisions of sec. 499.32 (4), Stats., to conform to the language of this court contained in that case. We conclude that the issuance of bonds in accordance with the directions of the act will not constitute a state debt nor a pledge of state credit in violation of the state constitution.

[13] *Nusbaum, supra,* footnote 3, at page 428.
[14] Sec. 499.31, Stats.
[15] Sec. 499.32 (4), Stats.
[16] *Supra,* footnote 3, at page 429.
[17] Sec. 234.15 (4), Stats.

3. *Tax exemption provision constitutional.* Art. VIII, sec. 1, of the Wisconsin Constitution provides for reasonable exemptions from taxation.

In sec. 499.17 (1) of the act, it is directed that:

". . . the authority is not required to pay any taxes or assessments, including mortgage recording taxes, upon or in respect of any property owned by the authority under this chapter and the income therefrom shall at all times be free from taxation of every kind by the state and by political subdivisions of the state."

The Housing Finance Authority Act granted a tax exemption on its "fees, charges, gifts, grants, revenues, receipts and other moneys received or to be received, pledged to pay or secure the payment of . . . notes or bonds . . . ."[18] In upholding the constitutionality of this exemption in *Nusbaum,* this court said that "[a]ny classification of taxation is permissible which has a reasonable relation to a legitimate end of governmental action."[19] Since the exemption aided the Authority in accomplishing its public purpose, by encouraging favorable sale of its bonds, it was deemed to be reasonable. Petitioner argues that the exemption in question here is similar in that it reduces charges for the Authority's facilities and services and the cost of its capital needs and thereby benefits the people of the state by promoting use of the Authority's facilities, thus aiding in the accomplishment of the purposes of the act. We agree.

A public purpose is served by the legislation creating the Solid Waste Recycling Authority and since the tax exemption aids this public purpose it is constitutional.

4. *"Home-Rule" provisions not violated.* The home-rule provision of the Wisconsin Constitution provides, under art. XI, sec. 3, as follows:

[18] Sec. 234.28, Stats.
[19] *Nusbaum, supra,* footnote 3, at pages 438, 439.

"Cities and villages organized pursuant to state law are hereby empowered, to determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as shall with uniformity affect every city or every village. The method of such determination shall be prescribed by the legislature."

We conclude that since the purpose of the act definitely involves a matter of statewide concern, this home-rule section does not invalidate provisions of the act dealing with required use of facilities,[20] user charges,[21] and condemnation powers.[22]

5. *Act contains no invalid limitations upon the power of the executive and future legislatures.* Sec. 499.32 (4), Stats., gives the following direction:

"(4) To assure the continued operation and solvency of the authority for the carrying out of the public purposes of this chapter, the authority shall accumulate in the capital reserve fund an amount equal to the capital reserve fund requirement. If at any time the capital reserve fund requirement exceeds the amount of the capital reserve fund, the chairman of the authority shall certify to the secretary of administration, the governor and the joint committee on finance the amount necessary to restore the capital reserve fund to an amount equal to the capital reserve fund requirement. If such certification is received by the secretary of administration in an even-numbered year prior to the completion of the budget compilation under s. 16.43, the secretary shall include the certified amount in the budget compilation. In any case, the joint committee on finance shall introduce in either house, in bill form, an appropriation of the amount so certified to the capital reserve fund of the authority.

[20] *Thompson v. Kenosha County* (1974), 64 Wis. 2d 673, 686, 221 N. W. 2d 845; *State ex rel. Brelsford v. Retirement Board* (1968), 41 Wis. 2d 77, 86, 163 N. W. 2d 153.

[21] *State ex rel. Martin v. Juneau* (1941), 238 Wis. 564, 569–571, 300 N. W. 187.

[22] *Lamasco Realty Co. v. Milwaukee* (1943), 242 Wis. 357, 375, 8 N. W. 2d 372, 8 N. W. 2d 865.

Recognizing its moral obligation to do so, the legislature hereby expresses its expectation and aspiration that, if ever called upon to do so, it shall make such appropriation."

Does this contain an unconstitutional limit on powers of the executive?

The Housing Finance Authority Act, sec. 234.15 (4), Stats. 1971, originally contained the following provision:

"(a) . . . in each even-numbered year . . . . The governor and the secretary of administration shall include in the biennial budget of the immediately succeeding odd-numbered year the amount so certified by the chairman of the authority.

"(b) In each odd-numbered year . . . . The governor shall, in the immediately succeeding even-numbered year, include this amount in his recommendations, in bill form, to the joint committee on finance for introduction without change in either house."

*Nusbaum*[23] held this section to be an invalid limitation on the powers given to the executive by art. V, secs. 4 and 10, Wisconsin Constitution, which provide as follows:

"**Powers and duties.** SECTION 4. The governor shall be commander in chief of the military and naval forces of the state. He shall have power to convene the legislature on extraordinary occasions, and in case of invasion, or danger from the prevalence of contagious disease at the seat of government, he may convene them at any other suitable place within the state. He shall communicate to the legislature, at every session, the condition of the state, and recommend such matters to them for their consideration as he may deem expedient. He shall transact all necessary business with the officers of the government, civil and military. He shall expedite all such measures as may be resolved upon by the legislature, and shall take care that the laws be faithfully executed."

"**Governor to approve or veto bills; proceedings on veto.** SECTION 10. . . . Every bill which shall have passed the

---

[23] *Supra,* footnote 3, at page 450.

legislature shall, before it becomes a law, be presented to the governor; if he approve, he shall sign it, but if not, he shall return it, with his objections, to that house in which it shall have originated, who shall enter the objections at large upon the journal and proceed to reconsider it. Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills. If, after such reconsideration, two-thirds of the members present shall agree to pass the bill, or the part of the bill objected to, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the members voting for or against the bill or the part of the bill objected to, shall be entered on the journal of each house respectively. If any bill shall not be returned by the governor within six days (Sundays excepted) after it shall have been presented to him, the same shall be a law unless the legislature shall, by their adjournment, prevent its return, in which case it shall not be a law."

According to the provisions of the act presently under consideration, the governor is required to do nothing. The secretary of administration, on the other hand, is required to include the item in his budget compilation. The secretary of administration is not a constitutional officer but rather an officer whose duties are solely prescribed by legislation,[24] and therefore the legislature can prescribe by statute whatever duties it thinks appropriate for the secretary, to become binding when, as herein, the governor has signed the statute into law. Even if it were to be found that a direction to the secretary of administration is tantamount to a direction to the governor, nevertheless such requirement is valid as only in the nature of a request that the matter be brought to the attention of the legislature, through inclusion in

[24] Chs. 15 and 16, Stats.

the budget compilation, rather than being stated in the terms of a required budget recommendation.

Does the act contain an unconstitutional limit on powers of the legislature?

In *Nusbaum*[25] this court declared a nullity the provisions of the Housing Finance Act which required the joint committee on finance to introduce in bill form without change in either house the capital reserve fund appropriation recommended by the governor. In *Nusbaum* it was stated that "[s]uch a legislative enactment . . . cannot have and does not have the effect of any limitation whatever upon the deliberations and actions of the joint finance committee in subsequent legislative sessions."[26] The analogous provision in the act under consideration here requires introduction of the bill by the joint finance committee for the amount of the deficit, but drops the requirement that it be "without change in either house." Such an omission is crucial and makes the provision valid as a mere rule of committee procedure, authorized by art. IV, sec. 8, Wisconsin Constitution, with no implications of control over the final deliberations or actions of future legislatures. That section provides:

"**Rules; contempts; expulsion.** SECTION 8. Each house may determine the rules of its own proceedings, punish for contempt and disorderly behavior, and with the concurrence of two-thirds of all the members elected, expel a member; but no member shall be expelled a second time for the same cause."

Therefore, there is no unconstitutional limitation on the powers of the legislature.

6. *The act involves no special nor private law.* The Housing Finance Authority Act was challenged on the

---

[25] *Supra,* footnote 3, at page 450.
[26] *Id.*

ground that the creation of the entity involved is prohibited by art. IV, secs. 31 and 32, Wisconsin Constitution.

Sec. 31 provides, in part:

". . . The legislature is prohibited from enacting any special or private laws in the following cases:

" . . .

"7th. For granting corporate powers or privileges, except to cities."

Sec. 32 provides:

". . . The legislature shall provide general laws for the transaction of any business that may be prohibited by section thirty-one of this article, and all such laws shall be uniform in their operation throughout the state."

In *Nusbaum*[27] this court held that the Housing Finance Authority was created in order to promote public and state purposes rather than private or local interests and, therefore, the Housing Finance Authority Act did not contravene these constitutional provisions.

Respondent articulates a detailed argument in support of its contention that the Solid Waste Recycling Authority Act is violative of these constitutional provisions. The respondent relies both on the effect of art. XI, sec. 1, Wisconsin Constitution, and on the decision in *Attorney General v. Railroad Companies*,[28] which authorities respondent contends were not before this court in its deliberations on the Housing Finance Authority Act. We disagree. Art. XI, sec. 1, of the Wisconsin Constitution provides:

". . . Corporations without banking powers or privileges may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature,

---

[27] *Id.* at pages 446, 448.
[28] (1874), 35 Wis. 425.

the objects of the corporation cannot be attained under general laws. All general laws or special acts enacted under the provisions of this section may be altered or repealed by the legislature at any time after their passage."

*Attorney General v. Railroad Companies* held that the special charters granted to the railway companies could be amended, under the reserved power of the second clause in art. XI, sec. 1, of the Wisconsin Constitution. This court said that the reserved power clause was not affected by the enactment of secs. 31 and 32 of the constitution. Rather, enactment of these sections affected the first clause of art. XI, sec. 1, only, making it a mandatory, rather than a directory provision.[29]

Respondent points out that the only corporations created by special law after the adoption of secs. 31 and 32 of the Wisconsin Constitution are the Armory Board, the Wisconsin Housing Finance Authority and the Authority herein.

In short, respondent argues that the phrase in art. XI, sec. 1, of the Wisconsin Constitution, "and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general law" has been effectively erased by the amendments to the constitution contained in art. IV, secs. 31 and 32, and the interpretation of the effect of those amendments.

Petitioner argues, on the other hand, that although *Attorney General,* and other related cases, hold that art. IV, sec. 31, Wisconsin Constitution, amended art. XI, sec. 1, nevertheless, the legal effect of those holdings is that since the time of the amendments the restrictions imposed by art. XI, sec. 1, are the same as those imposed

[29] *Attorney General v. Railroad Companies, supra,* footnote 28, at page 560. This section was originally construed as directory rather than mandatory, *Clark v. Janesville* (1859), 10 Wis. 119 (*136), 136 (*175).

by art. IV, sec. 31. Therefore, since *Nusbaum* construed art. IV, sec. 31, directly, reference to art. XI was unnecessary. We agree that *Nusbaum* is controlling here, since the Recycling Authority, no less than the Housing Finance Authority, involves a legitimate governmental and statewide purpose, rather than a special or private purpose.[30]

7. *The act does not violate prohibition against works of internal improvement.* Art. VIII, sec. 10, Wisconsin Constitution provides, in part:

". . . The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works."

In determining whether an act of the legislature violates a constitutional provision such as art. VIII, sec. 10, it is the obligation of this court to interpret the constitutional provision in the light of present-day conditions, especially when those conditions could not have been foreseen at the time the constitutional provision was adopted. In deciding whether a legislative enactment is constitutional we must consider the constitution as a living document which was drawn with the basic idea that the needs of the people of this state would necessarily change and that, therefore, the constitutional provisions having a limiting effect should be considered in the light of present conditions. No limiting constitutional provision in our Wisconsin Constitution has been subjected to more interpretation. In the most recent case involving an interpretation of that provision, *State ex rel. Warren v. Nusbaum*,[31] this court declared that the

---

[30] *Madison Metropolitan Sewerage District v. Stein* (1970), 47 Wis. 2d 349, 177 N. W. 2d 131.

[31] (1973), 59 Wis. 2d 391, 435, 436, 208 N. W. 2d 780. *See also: State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 402, 147 N. W. 2d 304.

court must be "cognizant of changing times and the ever-changing needs of the state and its people."

We conclude that there is no violation of the "works of internal improvement" provision.

A. *Wisconsin Solid Waste Recycling Authority is separate entity from state.* Wisconsin has long recognized the doctrine that where an entity other than the state carries on the work of the state, the entity is independent and thus saves the state from a violation of the internal improvement prohibition.[32]

There is no doubt here that the Solid Waste Recycling Authority is an independent authority from the state, that it is neither an arm nor an agent of the state, and that its activities are to be undertaken as an independent entity, free to carry on its operations without being bound by the prohibition of art. VIII, sec. 10, Wisconsin Constitution, barring state participation in works of internal improvement.[33]

The appropriation of $500,000 to the Solid Waste Recycling Authority for initial operating costs does not change this conclusion, any more than in *Nusbaum*, where a similar appropriation was made. A different case might be presented if this appropriation were made for the purpose of directly aiding the Authority to build some type of recycling facility. However, the appropriation is for initial planning, operations, and administrative expenses only. All funding for construction of internal improvements like transfer stations and recycling facilities will be derived, not from the state, but

[32] *Glendale Development v. Board of Regents* (1960), 12 Wis. 2d 120, 106 N. W. 2d 430; *Redevelopment Authority v. Canepa* (1959), 7 Wis. 2d 643, 97 N. W. 2d 695.

[33] For decisions of the Alabama Supreme Court to the same effect, *see: Edmonson v. State Industrial Development Authority* (1966), 279 Ala. 206, 184 So. 2d 115; *Knight v. West Alabama Environmental Improvement Authority* (1971), 287 Ala. 15, 246 So. 2d 903.

from the sale of bonds. In this situation, the one-time appropriation does not make the state a party to an internal improvement, any more than did the appropriation for the operating expenses of the Marquette School of Medicine in *State ex rel. Warren v. Reuter*,[34] or the appropriation for planning and study of a turnpike in *State ex rel. Thomson v. Giessel*.[35]

B. *Act validated by dominant public purpose.* If a law is predominately public in its aim, it will not be held to violate the internal improvements provision, in spite of the fact that the state carries on internal improvements incident to the main public purpose of the law. This was recognized in *Appeal of Van Dyke*,[36] where a taxpayer had challenged the validity of an unemployment relief income tax, which partially reimbursed counties and cities for the labor cost of public works. The taxpayer argued that such a state tax was unconstitutional, since it made the state a party to works of internal improvement. But the court did not agree:

". . . the primary purpose of the state was not to become a party to carrying on works of internal improvement, but to reimburse the counties and cities which had made work simply for the purpose of providing employment to the unemployed."[37]

The primary or dominant purpose approach of *Van Dyke* was relied upon by this court in the more recent case of *State ex rel. La Follette v. Reuter*.[38] In that case the court stated that prohibited works of internal improvement did not include those works which had the dominant purpose of preserving public health. Since water pollution was a matter of public health, it was held

[34] *Supra*, footnote 8, at pages 222, 223.
[35] (1953), 265 Wis. 185, 60 N. W. 2d 873.
[36] (1935), 217 Wis. 528, 544, 259 N. W. 700.
[37] *Id.*
[38] *Supra*, footnote 8, at page 402.

that a law which appropriated money for use by other governmental entities in constructing water pollution abatement facilities did not run afoul of the internal improvements prohibition. The more recent *Nusbaum Case* followed the same rationale. In that case the court gave a broad interpretation to *Van Dyke,* and used this interpretation to uphold the Housing Finance Authority:

"The court [in *Van Dyke*], having found a public purpose, declared that the carrying on of works of internal improvement was merely incidental thereto or a means to achieve the desired result. Any resulting internal improvement was not the ultimate purpose. In the instant case, the health, safety, and welfare of the people is the dominant purpose of ch. 234, Stats., and the construction of public housing is incidental thereto."[39]

In its original legislative findings here, the legislature concluded that prevailing waste disposal practices constituted "a continuing hazard to the health and welfare of the people of the state," and that the Solid Waste Recycling Authority was to serve the public purpose of "improving and otherwise promoting [the] health, welfare and prosperity" of the people of the state.[40] This court has previously recognized that the health, safety, and welfare of Wisconsin residents is a proper public purpose for the state to pursue,[41] and that legislation regarding abatement of water pollution is an acceptable and proper embodiment of that concern.[42] It follows that legislation aimed at abating the pollution of water, land, and air that may occur by inadequate solid waste disposal is also pursuant to a legitimate public purpose

[39] *State ex rel. Warren v. Nusbaum, supra,* footnote 3, at pages 436, 437.

[40] Sec. 1, ch. 305, Laws of 1973.

[41] *Nusbaum, supra,* footnote 3, at page 420.

[42] *State ex rel. La Follette v. Reuter, supra,* footnote 31, at pages 400–403.

of preserving the health, safety, and welfare of the people of our state.

It is also necessary, in view of the internal improvements prohibition of the Wisconsin Constitution, to determine that this public purpose is dominant. We have no doubt that it is. The main aim of the act is not the construction of transfer stations or recycling facilities by the Authority. This is merely an incidental means of achieving the overriding aim of public health, safety, and welfare through proper solid waste disposal and recycling. Indeed, that construction by the Solid Waste Recycling Authority of recycling facilities is merely incidental is abundantly clear from the act itself. For the act makes clear that private disposal facilities are an equal, if not superior, means of achieving the overall goal. Sec. 499.03 (4), Stats., states that private industry is to be used to the maximum extent feasible in constructing and operating the facilities. Sec. 499.16 (3) and (4m) give a preference to private means of disposal and recycling. If Authority construction of recycling facilities were the dominant purpose of the act, then these provisions would certainly not be present. Even if these provisions were not in the act, it could still be said that Authority construction of recycling facilities would be an incidental matter. The dominant purpose of this legislation, no matter who constructs the facilities, is the preservation of the health, safety, and welfare of the people of this state. Any internal improvement is not the ultimate purpose, but is merely the physical means for achieving that purpose. This was true of the construction of dormitories approved in *State ex rel. Thomson v. Giessel*.[43] In that case the construction of dormitories was the physical means of achieving the dominant public purpose of educating the citizens of this state.

---

[43] (1955), 271 Wis. 15, 72 N. W. 2d 577.

C. *Private capital unable to satisfy need.* In *Nusbaum* this court held that one of the reasons for approving the Wisconsin Housing Authority program, as against the charge that it authorized the state to engage in a work of internal improvement contrary to the Wisconsin Constitution, was a showing that private capital was unable to satisfy the housing finance need. In the instant case this court is not in a position to make a detailed economic analysis of the availability and inclination of private capital to undertake the construction and operation of solid waste recycling facilities. Although it is not conclusive here, the legislature did declare that private industry was "hard-pressed" to provide adequate services in this area, and that both prior governmental regulation and high financing costs "greatly limit the ability" of the solid-waste management industry to engage profitably in enterprises of this type.[44] Respondent urges this court to take judicial notice of a formal contract entered between the city of Milwaukee and the American Can Company, according to which this private company will construct a large recycling plant in the Milwaukee area. Yet it must be freely conceded that, simply because the overwhelmingly largest metropolitan area of the state is able to attract private industry does not mean that other less populous regions of the state will be so fortunate. Moreover, it should also be recognized that the act will encourage, rather than obstruct, cooperation between government and private industry.[45]

8. *Delegation of authority valid.* Respondent argues that if the Authority is not an arm or agency of the state, the powers delegated to it are sovereign in nature and in excess of those which can be validly delegated by the legislature. Respondent contends that the Authority is given greater powers than those delegated by

---

[44] Sec. 1, ch. 305, Laws of 1973.
[45] Sec. 499.03 (4), (5), Stats.

the legislature to the Housing Finance Authority, and emphasizes in particular the facts that the Authority may establish regions under sec. 499.10, Stats., and require use of its facilities by any person under sec. 499.16, after appropriate fact-finding procedures.

The real issue here concerns the nature of the authority delegated. In other words, is the power given that of being able to make law or to implement the law, in accordance with the test set forth in *Nusbaum*,[46] and supported by cases cited therein?

The serious questions raised by the problem of delegation relate normally to the absence of standards to guide the entity in implementing the statute in question.[47] But sec. 499.16, Stats., sets out the standards against which the Authority is to measure the facts found at a hearing on required use; sec. 499.10 (5) gives criteria for establishment of regional boundaries. These standards place the power in question here within the ambit of that sanctioned in *Nusbaum*. "The Authority is not delegated the power to make law but to make factual determinations in execution of the law as declared by the legislature."[48]

9. *Classification not unreasonable.* Respondent asserts that the regional system set up by the act could result in unreasonable classifications of governmental subdivisions, in violation of art. IV, sec. 23, Wisconsin Constitution ("The legislature shall establish but one system of town government, which shall be as nearly uniform as practicable"), as to towns, and art. IV, sec. 32, Wisconsin Constitution ("The legislature shall provide general laws for the transaction of any business that

---

[46] *Supra*, footnote 3, at page 443.

[47] *Clintonville Transfer Line v. Public Service Comm.* (1945), 248 Wis. 59, 21 N. W. 2d 5.

[48] *Nusbaum, supra*, footnote 3, at page 443. *See also: Union Lime Co. v. Railroad Comm.* (1911), 144 Wis. 523, 129 N. W. 605.

may be prohibited by section thirty-one of this article, and all such laws shall be uniform in their operation throughout the state"), as to cities and villages. It is argued that, even though this court has stated that refuse problems are related directly to the concentration of population,[49] nevertheless the first three regions set up by the act bear no relation to population distribution. It is argued further that the standards set up by the act for additional inclusions in regional schemes[50] are related to the profitability of the Authority rather than to the allegedly public and statewide purposes of the act. Respondent concludes that although the system of classification may be reasonable in terms of implementation of the statutory scheme, it is arbitrary in terms of settled law requiring that legislative classifications be based on substantial distinctions which reflect a real differentiation among classes, which have equal applicability to each member of the class, and which are related to the purpose of the law.[51]

But no legislative classification can be declared invalid unless it is established beyond a reasonable doubt that the classification bears no reasonable relationship to the purposes underlying it.[52] The act does not classify governmental subdivisions as such, but rather directs a regional approach to accomplish the underlying purposes of the act, and provides appropriate criteria to guide the Authority in its decisions as to inclusions within those regions.[53]

---

[49] *West Allis v. Milwaukee County, supra,* footnote 9, at pages 372, 373.

[50] Sec. 499.10 (5), Stats.

[51] *West Allis v. Milwaukee County, supra,* footnote 9; *Hjelming v. La Crosse County* (1926), 188 Wis. 581, 206 N. W. 885.

[52] *State ex rel. La Follette v. Reuter* (1967), 36 Wis. 2d 96, 109, 153 N. W. 2d 49.

[53] Secs. 499.10 (5), 499.11, and 499.16, Stats.

We determine that the criteria for regionalization as set forth in sec. 499.10, Stats., establish a classification scheme which is reasonable in terms of accomplishing the goals of protection of public health, welfare, comfort and environmental quality, and that therefore the constitutional requirement is met by the act.[54]

10. *Reserved power not contravened.* Art. XI, sec. 1, Wisconsin Constitution, provides in part that: ". . . All general laws or special acts enacted under the provisions of this section may be altered or repealed by the legislature at any time after their passage." Sec. 499.02 (4), Stats., directs that "The authority shall continue in existence until terminated by law, but no such law shall take effect while the authority has obligations outstanding."

Respondent contends that sec. 499.02 (4), Stats., violates the reserved power provisions of the constitutional clause (art. XI, sec. 1) in light of the court's direction in *Attorney General v. Railroad Companies,*[55] that the words of the provision be construed according to their terms alone.

Respondent's argument is meritless for two reasons. First, the Authority is not a corporation in the normal sense,[56] and was not created pursuant to art. XI, sec. 1, Wisconsin Constitution. Since sec. 1 is directed to laws enacted under the provisions of that section, the reserved power clause is inapplicable to the act under consideration.

Secondly, the power to repeal statutes may be limited by state and federal constitutional provisions. Both the Wisconsin Constitution and the United States Constitution contain nonimpairment of contract obligation

[54] *State ex rel. La Follette v. Reuter, supra,* footnote 52, and cases cited therein.

[55] *Supra,* footnote 28, at pages 576, 577.

[56] *Nusbaum, supra,* footnote 3, at page 446.

clauses.[57] Any attempt to terminate the Authority while it has outstanding obligations would be an invalid impairment of contractual rights.[58]

If the Authority is not created pursuant to or affected by the provisions of art. XI, sec. 1, Wisconsin Constitution, by reason of the fact that it is not a corporation in the normal sense and the obligations to be entered into by the Authority will give rise to valid and valuable contract rights, then we fail to see how the act could be in contravention of the "reserved power" clause.

*By the Court.*—Declaratory judgment granted adjudging ch. 305, Laws of 1973, creating the Wisconsin Solid Waste Recycling Authority to be a valid enactment; the respondent is enjoined to issue the requested warrant for the $500,000 approved by secs. 2 and 3 of ch. 305, Laws of 1973, to the Wisconsin Solid Waste Recycling Authority.

CONNOR T. HANSEN, J. *(dissenting)*. This writer respectfully dissents from the decision of the majority of the court.

Ch. 305, Laws of 1973, creates ch. 499 of the Wisconsin statutes. This legislation purports to create an entity identified as a "public body corporate and politic" (sec. 499.02 (1), Stats.) to be known as the "Wisconsin Solid Waste Recycling Authority."

The act proclaims that recycling from "solid waste is necessary to protect the public health and quality of the natural environment." Such is a laudable objective; nevertheless, the Authority is primarily a manufacturing operation. There is no precedent for such an activity in the annals of Wisconsin history. It will manufacture solid wastes into recycled materials for sale, presumably

[57] Art. I, sec. 12, Wis. Const.; art. I, sec. 10, United States Const.
[58] *Herro v. Wisconsin Federal Surplus Property Development Corp.* (1969), 42 Wis. 2d 87, 166 N. W. 2d 433.

to private industry. Sec. 499.03 (4), Stats., provides that the Authority utilize private industry to the maximum extent "feasible." However, sec. 499.16, for all practical purposes, permits the Authority to extend its operation into both private and local municipal sectors upon a legislative type determination of public interest.

The Authority is composed of seven members appointed by the governor with the advice and consent of the senate. Sec. 499.02, Stats. Basically, it is the intent of the act that the operation of the Authority be financed by the issuance of its bonds. The board of engineering consultants appointed to assist in the development of the legislation estimated that total capital cost of instituting a statewide regional recycling system would be approximately $120,000,000, in terms of 1973 dollars.

The act also provides for a "capital reserve fund requirement." It establishes a procedure involving the governor and the joint committee on finance of the legislature, whereby it can go to the legislature in future years to replenish the fund if needed. Sec. 499.32, Stats.

Sec. 499.10, Stats., contemplates that the Authority will ultimately divide the entire state into regions. However, to further implement the Authority and without setting forth any reason or justification whatever, the act first creates three regions. They are:

(a) Fond du Lac, Outagamie and Winnebago counties;

(b) Lincoln, Marathon, Portage and Wood counties; and

(c) Milwaukee, Ozaukee, Washington and Waukesha counties.

After a determination of "best public interest," the Authority can require such municipalities as it chooses within the boundaries of a region to use its facilities. The municipalities which the Authority so decides must use its facilities shall pay the Authority a reasonable sum, to be determined by the Authority for bringing its solid wastes to the place designated by the Authority.

After a nonjudicial-type hearing the Authority can make a determination of "best public interest" based upon any one of several findings, including the following:

"(d) Required use is necessary to achieve operational volumes necessary to make the authority financially self-supporting to the greatest extent possible." Sec. 499.16 (2) (d), Stats.

The act gives the Authority complete charge of serving such parts of the state or even regions, when it chooses and how it chooses.

Sec. 499.02 (4), Stats., provides that no law terminating the existence of the Authority shall take effect while it has obligations outstanding. Under sec. 499.25, the Authority may issue notes and bonds as it deems expedient. Thus, any subsequent legislature is precluded from terminating the existence of the Authority. It can, by its own action, perpetuate itself to infinity. This must be the intention of the act because it provides absolutely no method for either voluntary or legislative liquidation of the manufacturing facilities.[1] In fact, the act by its very terms creates a situation whereby the legislature could not terminate its existence if the Authority elected to perpetuate itself by the continued creation of outstanding obligations.

In my opinion, no legislation closely comparable to ch. 499, Stats., has ever been declared constitutional. While one's sensitivities and judgment recognize the abiding concern to protect our environment and properly husband our natural resources, such fundamental beliefs do not justify the approval of what I believe to be unconstitutional legislation.

Admittedly, the legislative statement of purpose of the act is relevant:

---

[1] Sec. 499.36, Stats., relates to procedures required in the event the Authority defaults in its obligations.

"Nevertheless, when legislation is challenged, the justices of this court deem it their unavoidable burden under the constitution to examine such legislation and to assess its *realistic operation*. Although the legislative declarations are entitled to great weight, we may not blindly accept at full value even the most elaborate prefatory expressions concerning community need, economic impact, or public purpose. . . ." (Emphasis added.) *State ex rel. Bowman v. Barczak* (1967), 34 Wis. 2d 57, 65, 66, 148 N. W. 2d 683.

In arriving at its ultimate conclusions as to the constitutionality of the act, the majority appears to place considerable emphasis and weight upon abstract general statements of law in *State ex rel. Warren v. Nusbaum* (1973), 59 Wis. 2d 391, 208 N. W. 2d 780, without regard to their particular applicability to the factual situation to which they are applied. *Nusbaum* found constitutional an act creating the "Wisconsin housing finance authority." In essence, the Wisconsin housing finance authority was created to assist in the financing of certain declared needed housing facilities through existing channels of the commerce and construction industry. It did not authorize construction, selling and leasing of housing facilities by the Authority. Had the act purported to give the Wisconsin housing finance authority such authority this writer would have been compelled to find the act unconstitutional. As contrasted to the Wisconsin housing finance authority, the instant act purports to give the Authority the right to develop manufacturing facilities to produce recycled solid waste for sale.

In my opinion, such activity by the Authority consists of a clear act of internal improvement in violation of art. VIII, sec. 10, Wisconsin Constitution.

I am unable to dismiss the internal improvement argument as does the majority. Without establishing any definitive nature of the Authority as an entity, the majority decides what is not.

"There is no doubt here that the Solid Waste Recycling Authority is an independent authority from the state, that it is neither an arm nor an agent of the state, and that its activities are to be undertaken as an independent entity . . . ."

This conclusion is supported by citation of two authorities from Alabama, which I find to be unpersuasive.

An examination of the history of the internal improvement clause and its application leads to the inescapable conclusion that the only way the state can provide the financial assistance necessary for the building and operating of these facilities by an entity of its own creation is through the avenue of a constitutional amendment.

The birth of the internal improvement clause was not an easy one. In fact it was a significant contributing factor to the need for two state constitutional conventions.[2] It became a part of the constitution as a result of the "plunge into the gulf of internal improvements which had swallowed up the credit and prosperity of so many states." *State ex rel. Owen v. Donald, supra,* page 83.

The creation of this Authority is not designed to provide limited financial assistance for various municipalities to carry on works of internal improvements by governmental subdivisions as in all previously decided cases. Rather it is a plan to do it for them through some kind of an entity created by the legislature. I cannot subscribe to the idea that the issuance of bonds, not to exceed $16,000,000 to build these plants in but three areas of the state, and incurring expenses not to exceed $600,000 annually in administrative costs, is *incidental*

---

[2] *State ex rel. Jones v. Froehlich* (1902), 115 Wis. 32, 91 N. W. 115; *State ex rel. Owen v. Donald* (1915), 160 Wis. 21, 151 N. W. 331; *State ex rel. Martin v. Giessel* (1948), 252 Wis. 363, 371, 31 N. W. 2d 626.

to the dominant purpose of the act. The reality of the situation is that the intent and purpose of the act cannot be implemented unless the state provides a financial means for building the recycling plants by the "public body corporate and politic" of its own creation.

In my opinion, the history of the amendments to our constitution support the conclusions that the establishment of this Authority to accomplish this end is an internal improvement.

Since the adoption of the constitution it has been found necessary to amend it to permit the state to carry on the following internal improvements: 1908-highway construction; 1945-airport and other aeronautical projects; 1948-veterans' housing; 1960-port facilities; 1968-development of forests; and, most recently, mass transit.

To follow the rationale of the majority to what, to me, is its logical conclusion, would mean that none of these constitutional amendments were necessary if the legislature had chosen to delegate its authority to an entity, "public body corporate and politic" with an appropriate declaration of public purpose. If such is the conclusion of the present majority of the court, I cannot subscribe to it.

In my opinion, the Wisconsin cases cited lend little support to the conclusion of the majority. *Glendale Development v. Board of Regents* (1960), 12 Wis. 2d 120, 106 N. W. 2d 430, stands for the proposition that friends of the university could organize a nonprofit corporation to carry on internal improvements for the university. *Redevelopment Authority v. Canepa* (1959), 7 Wis. 2d 643, 97 N. W. 2d 695, recognized the well-established exception that *governmental subdivisions* are not subject to the prohibition. *Nusbaum, supra,* is also readily distinguishable on its facts. The construction of no facility of any kind was involved.

*State ex rel. Thomson v. Giessel* (1954), 267 Wis. 331, 65 N. W. 2d 529, involved a private corporation and the

construction of a state office building, which itself is not a work of internal improvement. *State ex rel. Thomson v. Giessel* (1955), 271 Wis. 15, 72 N. W. 2d 577, found that a structure used by the state university for educational purposes was excluded from being a work of internal improvement.

*State ex rel. La Follette v. Reuter* (1967), 36 Wis. 2d 96, 153 N. W. 2d 49, related to a nonprofit corporation organized to sell bonds for highway purposes. *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 147 N. W. 2d 304, provided funds to municipalities to assist in construction of water pollution abatement facilities. *State ex rel. Warren v. Reuter* (1969), 44 Wis. 2d 201, 170 N. W. 2d 790, appropriated state funds to Marquette School of Medicine for operating expenses for research and educational activities.

*Appeal of Van Dyke* (1935), 217 Wis. 528, 259 N. W. 700, provided funds through the industrial commission to *reimburse* counties for a percentage of funds *expended* by them to provide employment for the unemployed. *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 277 N. W. 278, 280 N. W. 698, relates to encouraging others to form municipal power districts and did not involve the state or a legislatively created entity in the construction of power plants.

None of these cited cases even closely resemble the factual situation presented and the ultimate decision in each is irrelevant to this case.

The fact that private capital may not readily fulfill the need identified by the act does not necessitate fulfilling the needs in this manner. Other procedures or methods are available which would not contravene the internal improvement prohibition. Aid could be provided to governmental subdivisions as approved in prior cases or by constitutional amendment as used in certain instances.

Art. IV, sec. 1, Wisconsin Constitution, restricts the delegation of power by the legislature. It is my belief

that the power given this Authority is violative of this constitutional provision. Once again the majority relies on language abstracted from *Nusbaum, supra,* and once again it is pointed out that the type of authority validated in *Nusbaum* is entirely different than that under consideration in the instant case.

*Nusbaum, supra,* made clear, at page 395, that:

"The act contemplates that the Authority will issue notes and bonds, presumably at a lower rate of interest because of their contemplated tax-exempt status. The Authority, in turn, will make money available to the housing industry at reduced rates. The developers will then be able to sell or rent housing to low and moderate income families, thereby tending to eliminate substandard housing conditions in the state and accomplish other objectives set forth in the enabling legislation."

In contrast, the recycling authority is invested with power to govern the people of the state in certain aspects. It is in complete charge of building and maintaining a solid waste recycling system serving such parts of the state as it chooses.

One particularly significant power of government given the Authority is that set forth in sec. 499.16, Stats. It can require such municipalities, private corporations, and even individuals to use its manufacturing facilities when it chooses if the Authority "finds such use to be in the best public interest." As previously stated, such "best public interest" can exist on no finding other than that the use is necessary to help the Authority become financially self-supporting. Sec. 499.16 (2) (d).

We are not here concerned with whether the state has the power or authority to so govern the lives of the people. What we are concerned with is whether the state can delegate such great power and authority to an entity which both the legislature and the majority have gone to considerable length to disavow is an agency or arm of the state. So far as I can ascertain, such an attempted

delegation of power to govern the people of the state has never before been validated by this court. I would not be one to put a stamp of approval on the establishment of such a governmental process.

*Clintonville Transfer Line v. Public Service Comm.* (1945), 248 Wis. 59, 21 N. W. 2d 5, and *Robertson Transportation Co. v. Public Service Comm.* (1968), 39 Wis. 2d 653, 159 N. W. 2d 636, are inapposite. Both of those cases go directly to the question of appropriate legislative guidelines for a *state agency* to implement the law.

Art. XI, sec. 1, of the Wisconsin Constitution is frequently referred to as the "reserved power clause." I respectfully submit that the response of the majority to the argument that ch. 499, Stats., contravenes this clause, begs the question.

Sec. 499.02 (4), Stats., provides that no law terminating the authority shall take effect while the Authority has outstanding obligations. Sec. 499.07 authorizes the Authority to incur obligations in a wide variety of ways, including, but not limited to, contracts, notes and bonds. To me, this language of the act is explicit and unambiguous. Is the effect of these provisions any different than that of an enactment boldly stating that this law can never be repealed if the Authority elects to continue in operation? I think not.

The nonimpairment of contract clauses in both state and federal constitutions, in my opinion, add no support to the position advanced by the majority in disposing of the issue on the reserved power clause. The act clearly gives the Authority absolute authority to incur continuing obligations and forecloses any possible termination by the legislature so long as these obligations exist. Absent these nontermination provisions of the act, any future legislature could, in its wisdom, terminate the existence of the Authority by appropriate arrangements to recognize the then outstanding obligations of the Authority.

Hence the provisions of the nonimpairment of contract clauses would be fully accommodated. But this act by its very terms prohibits the termination of the Authority by any future legislature if the Authority chose to extend its existence.

I believe there are other provisions of ch. 499, Stats., which are subject to challenge and arguable merit. However, having expressed my opinion on certain provisions of the act, little will be added by the discussion of additional issues.

It is my conclusion that ch. 499, Stats., should be declared unconstitutional. I am authorized to state that Mr. Justice HANLEY and Mr. Justice ROBERT W. HANSEN concur in this conclusion.